Charles R. TUNLEY et al., Appellants
and Cross-Appellees,

v.

MUNICIPALITY OF ANCHORAGE
SCHOOL DISTRICT et al., Appel-
lees and Cross-Appellants.

Nos. 4796, 4797 and 4826.

Supreme Court of Alaska.

Sept. 12, 1980.

As Amended on Denial of Rehearing
Jan. 29, 1981.

Charles R. Tunley, pro se, Anchorage, for appellant and cross-appellee Tunley.

Joe P. Josephson, Josephson, Trickey & Lorensen, Inc., Anchorage, for appellant and cross-appellee Niebert.

Peter C. Partnow, Hellen & Partnow, Anchorage, for appellees and cross-appellants.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ.

## OPINION AS AMENDED ON REHEARING

RABINOWITZ, Chief Justice.

The school age population of Anchorage is currently about 1,250 students less than it was at peak enrollment in 1976. Although it is debatable whether the decline in student population will continue, it is undisputed that at this time, Anchorage has a surplus of available classrooms, including eighty elementary school rooms. Because it is economically inefficient to operate schools at less than capacity, the Anchorage school administration in their draft Capital Improvement Plan for 1979–85 included school closure as a possible method of dealing with the surplus classroom space.

The Anchorage School Board considered the various options presented in the Capital Improvement Plan, and in a public board meeting on February 15, 1979, decided to close two elementary schools for the 1979–80 school year. The Anchorage school district administration was directed to prepare recommendations on schools amenable to closure.

The district administration decided on its recommendations for closure by ranking all elementary schools in the district according to criteria developed by the administration. The administration ultimately recommended that Woodland Park and Government Hill elementary schools be closed, and their recommendation was adopted by the Anchorage School Board on March 12, 1979. There were no public hearings held before the school board reached its closure decisions, although the school board meetings were open to the public. Government Hill

is leased by the Anchorage Municipality from the Department of the Air Force, and because the lease is limited to school purposes only, the school site may revert to the Air Force if the elementary school is closed.

In a joint meeting of the Anchorage School Board and Municipal Assembly on March 5, 1979, both bodies adopted a resolution returning to the school board any funds obtained from disposal of the sites of the two schools. The municipal assembly did not attempt to assert control over which schools the board would be allowed to close.

Plaintiffs Tunley and Niebert are both the parents of school-aged children who attend Woodland Park and Government Hill elementary schools, respectively. Both parents filed lawsuits to prevent the closure of the schools; the suits were consolidated. The Anchorage School District filed a motion for summary judgment, and plaintiffs responded with a statement of genuine issues and their own motion for summary judgment. Summary judgment was granted in favor of defendants and this appeal followed.

## I. DID THE SUPERIOR COURT ERR IN DENYING NIEBERT'S PEREMPTORY CHALLENGE OF JUDGE RIPLEY?

Tunley's complaint was filed on March 19, 1979, and Niebert's complaint was filed three weeks later on April 9, 1979. The Tunley case was assigned to Superior Court Judge Ripley, and the Niebert case was assigned to superior Court Judge Singleton.

The defendants, the Anchorage School Board and School District Superintendent, John Peper, moved to consolidate these cases and for a hearing on shortened time on the consolidation question. These motions were granted.[1]

On April 13, 1979, the day after the motion to consolidate was granted, Niebert filed a notice of change of judge, in which he "exercise[d] his right to [a peremptory] challenge [of] the Honorable Justin Ripley, Superior Court Judge presently assigned to the action by his Order of April 12, 1979." The defendants subsequently filed a memorandum opposing the requested change of judge, which argued that Niebert had waived his right to a peremptory challenge of Judge Ripley since Niebert had "participated in a Motion to Consolidate the captioned case before Honorable Justin Ripley.". The defendants' memorandum further stated:

> At that time, affidavits submitted by both Plaintiffs [opposing consolidation] were before the Court. In addition, the decision on consolidation concerned the merits of the captioned cases in that the Judge had to determine whether or not the cases were sufficiently similar so as to require consolidation.

The presiding judge denied Niebert's peremptory challenge without any statement of reasons, and no indication appears in the record on appeal that any hearing was had on the question.

■ Peremptory challenge rights are granted litigants by AS 22.20.022.[2] This

---

1. On April 12, 1979, a hearing was held on this motion before Judge Ripley. Tunley and Niebert voiced their opposition to consolidation on several grounds, chief among which was the existence of different factual and legal issues as to the closing of each school, the concern with the difficulties in coordinating the presentation of their respective cases, and the concern expressed by Niebert's attorney that the expedited pretrial schedule already established in the Tunley case would not allow him adequate preparation time. Judge Ripley decided that consolidation was appropriate in light of the several legal issues common to both cases, though expressly leaving open the possibility of severance at a later time prior to trial on any unresolved factual issues. At the end of the

hearing, Judge Ripley said: "The order has been signed consolidating the cases, and they will be assigned to myself."

2. AS 22.20.022 provides:
 *Peremptory disqualification of a superior court judge.* (a) If a party or his attorney in a district court action or a superior court action, civil or criminal, files an affidavit alleging under oath that he believes that he cannot obtain a fair and impartial trial, the presiding district court or superior court judge, respectively, shall at once, and without requiring proof, assign the action to another judge of the appropriate court in that district, or if there is none, the chief justice of the supreme court shall assign a judge for the

statute creates peremptory challenge rights in both criminal and civil proceedings. In *Gieffels v. State*, 552 P.2d 661, 667 (Alaska 1976), this court held that AS 22.20.022 created the "substantive right" to a peremptory challenge, but that Alaska Criminal Rule 25(d) is the sole provision which may be consulted in determining whether the peremptory right was properly exercised and in determining the effect of the peremption on the procedural and administrative functions of the court system.[3] The civil rule counterpart to Alaska Rule of Criminal Procedure 25(d) is Alaska Rule of Civil Procedure 42(c), also promulgated by this court in 1974. While the question has not been directly addressed by this court, it seems apparent that the principle of *Gieffels* applies with equal force to peremptory challenges in civil proceedings,[4] and that Alaska Rule of Civil Procedure controls the procedure and scope of such challenges.[5]

hearing or trial of the action. The affidavit shall contain a statement that it is made in good faith and not for the purpose of delay.

(b) No judge or court may punish a person for contempt for making, filing or presenting the affidavit provided for in this section, or a motion founded on the affidavit.

(c) The affidavit shall be filed within five days after the case is at issue upon a question of fact, or within five days after the issue is assigned to a judge, whichever event occurs later, unless good cause is shown for the failure to file it within that time.

(d) No party or his attorney may file more than one affidavit under this section in an action and no more than two affidavits in an action.

For an excellent discussion of the development of peremptory challenges in Alaska, *see* Note, *Peremptory Challenges of Judges in the Alaska Courts*, 6 U.C.L.A.—Alaska L.Rev. 269, 271–77 (1977). For a comprehensive review of state peremption statutes generally, *see* Note, *Disqualification of Judges for Prejudice or Bias—Common Law, Evolution, Current Status and the Oregon Experience*, 48 Or.L.Rev. 311 (1969).

3. Alaska R.Crim.P. 25(d), therefore, "regulates only the procedural aspects of the peremptory right created by AS 22.20.022, and to the extent that the rule does not infringe upon the substantive right created by statute, the provisions of Rule 25(d) supersede the legislative enactment." *Gieffels v. State*, 552 P.2d 661, 667–68 (Alaska 1976). *See also Padie v. State*, 566 P.2d 1024, 1029–30 (Alaska 1977).

4. In several civil appeals since *Gieffels*, this court has discussed the validity of peremptory challenges in terms of the requirements of Alaska R.Civ.P. 42(c). *See Priest v. Lindig*, 591 P.2d 1299, 1301 (Alaska 1979); *Esch v. Superior Court of Third Judicial Dist.*, 577 P.2d 1039, 1041–42 (Alaska 1978); *Veazey v. Veazey*, 560 P.2d 382, 384 (Alaska 1977). One commentator, discussing the meaning of *Gieffels*, has stated:

whether the statute or the rules of court govern the Alaska peremptory challenge provisions. The holding concedes to the legislature the power to grant the right to challenge a judge, but not the right to devise a method to effectuate that challenge. Because *Gieffels* was a criminal case, the decision purported to decide only the status of Criminal Rule 25(d). However, because its companion rule, Civil Rule 42(c), provides nearly identical provisions, the rationale for the court's views in *Gieffels* should apply with equal force to a civil case, and there appears to be no reason why the *Gieffels* holding should not be extended to civil cases as well. Indeed, it may be argued that the court has probably accomplished such an extension sub silentio. Therefore, it can be concluded that AS 22.20.022 provides only the *right* to preempt a judge. Insofar as it attempts to set forth any procedural guidelines, it has been thoroughly discredited.

Note, *Peremptory Challenges of Judges in the Alaska Courts*, 6 U.C.L.A.—Alaska L.Rev. 269, 277 (1977) (footnote omitted) (emphasis in original).

5. Alaska R.Civ.P. 42(c) provides, in part:

*Change of Judge as a Matter of Right.* In all courts of the state, a judge or master may be peremptorily challenged as follows:

(1) *Nature of Proceeding.* In an action pending in the Superior or District Courts, each side is entitled as a matter of right to a change of one judge and of one master. Two or more parties aligned on the same side of an action, whether or not consolidated, shall be treated as one side for purposes of the right to a change of judge, but the presiding judge may allow an additional change of judge to a party whose interests in the action are hostile or adverse to the interests of another party on the same side. A party wishing to exercise his right to change of judge shall file a pleading entitled "Notice of Change of Judge." The notice may be signed by an attorney, it shall state the name of the judge to be changed, and it shall neither specify grounds nor be accompanied by an affidavit. A judge may honor an informal request for change of judge. When he does so, he shall enter upon the record the date of the request and the name of the party or parties requesting change of judge. Such

■ Since Niebert filed his peremptory challenge of Judge Ripley the day after being notified that his case was effectively reassigned to Judge Ripley,[6] there is no question but that that challenge was timely under Civil Rule 42(c)(3), which provides that a notice of change of judge is timely "if filed before commencement of trial and within five days after notice that the case has been assigned to a specific judge."[7] Niebert had notice as to the specific judge who would be hearing his case only when consolidation, which both he and Tunley opposed, and assignment to Judge Ripley were ordered. Thus, we conclude that Niebert's challenge was timely.[8]

Appellees' opposition to the notice of change of judge was based on the argument that Niebert had waived his right to such a change pursuant to the waiver provisions of Civil Rule 42(c)(4)(i). That section of Rule 42 provides:

(4) *Waiver.* A party waives his right to change a particular judge as a matter of right when he knowingly participates before that judge in:

(i) Any judicial proceeding which concerns the merits of the action and involves the consideration of evidence or of affidavits; . . .

More particularly, appellees argued that Niebert waived his right to a peremptory challenge by submitted an affidavit opposing consolidation and appearing before Judge Ripley in the hearing on the motion to consolidate.

■ These actions cannot be said to be a waiver under Alaska Rule of Civil Procedure 42(c)(4) for the following reasons. First, as Niebert's supplemental brief ar-

---

action shall constitute an exercise of the requesting party's right to change of judge.

. . . .

(3) *Timeliness.* Failure to file a timely notice precludes change of judge as a matter of right. Notice of change of judge is timely if filed before commencement of trial and within five days after notice that the case has been assigned to a specific judge. . . . Where a party enters an action after the case has been assigned to a specific judge, a notice of change of judge shall also be timely if filed by the party before the commencement of trial and within five days after he appears or files a pleading in the action.

(4) *Waiver.* A party waives his right to change a particular judge as a matter of right when he knowingly participates before that judge in:

(i) Any judicial proceeding which concerns the merits of the action and involves the consideration of evidence or of affidavits; or

(ii) A pretrial conference; or

(iii) The commencement of trial; or

(iv) If the parties agree upon a judge to whom the case is to be assigned. Such waiver is to apply only to the agreed-upon judge.

6. Judge Ripley intended that the actions brought by Tunley and Niebert retain their separate identity, as he expressly left open the possibility that they might be severed should trial become necessary. In this analytical context, Judge Ripley's consolidation of these cases and assignment of himself as trial judge was, as he recognized, tantamount to a reassignment of Niebert's case from Judge Singleton to himself.

7. *See Hartford Accident & Indem. Co. v. State*, 498 P.2d 274 (Alaska 1972), where we stated that "an action is not 'assigned to a judge' within the meaning of AS 22.20.022(c) until it has been assigned to a particular judge and a reasonable attempt has been made to notify the parties before the court of that assignment." *Id.* at 276 (footnote omitted) (emphasis in original). *See also Pope v. State*, 478 P.2d 801, 803–04 (Alaska 1970), *reh. denied*, 480 P.2d 697 (Alaska 1971); *Roberts v. State*, 458 P.2d 340, 346 (Alaska 1969).

8. This conclusion effectuates the purpose of Civil Rule 42(c)(3) and preserves the separate identity of the Niebert lawsuit. *See Roberts v. State*, 458 P.2d 340, 346 (Alaska 1969) (discussing the purpose of time requirements under AS 22.20.022); *Pope v. State*, 478 P.2d 801, 804 (Alaska 1970), *reh. denied*, 480 P.2d 697 (Alaska 1971), in which we stated:

Appellant correctly points out that the granting of the five-day period is to allow a party or his attorney an opportunity to investigate the judge to whom the case is assigned and if necessary file the requisite affidavit for disqualification, thus avoiding the waste of judicial time which would result if an affidavit or disqualification were not filed until the date of trial because this would mean that the case would have to be continued until another judge could be assigned and the disqualified judge would not be ready at that time to start the trial of another action. [footnote omitted]

*See also McCracken v. State*, 521 P.2d 499, 510–11 (Alaska 1974); 5 Moore's Federal Practice § 42.02, at 42–21 to 42–22 (1979).

gues, the section requires that a party "knowingly" participate before the challenged judge. Niebert's supplemental brief states:

> Niebert appeared before Judge Ripley, too whom the Tunley case had been assigned, *solely* to oppose defendants' motion to consolidate the two cases. Niebert had no way of knowing, before Judge Ripley decided the consolidation motion, whether consolidation would be granted, and, if so, whether Judge Singleton or Judge Ripley would preside over the consolidated cases.

This requirement of a knowing waiver requires that waiver can be found only where the requisite participation occurs after the party is informed that the judge before whom he or she is appearing is the judge permanently assigned to hear the case or is assigned for trial. Any other interpretation would be inconsistent with the apparent reason for this scienter requirement [9] and with the due process right to a fair and impartial trial judge which Alaska's peremptory challenge provisions are designed to liberally ensure.[10] In this sense, Niebert cannot be said to have "knowingly" participated before Judge Ripley in this case and to have waived his peremptory challenge rights.[11] The superior court's erroneous denial of Niebert's notice of change of judge must be reversed and Niebert's action remanded with directions that Niebert's case be considered by a superior court judge other than Judge Ripley.[12] However, this

---

**9.** One commentator has suggested the following as the origin of the requirement of knowing participation in Alaska R.Civ.P. 42(c)(4):

> The element of scienter in the waiver derives from the practice of the Fourth Judicial District (Fairbanks) not to assign judges to specific cases until the actual hearing date, which makes timely challenge impossible. The court has implored the Fourth Judicial District to change its policy in three different cases: *Hartford Accident & Indem. Co. v. State*, 498 P.2d 274, 275–76 n.5 (Alaska 1972); *Pope v. State*, 478 P.2d 801, 803, *reh. denied*, 480 P.2d 697 (Alaska 1971); and *Roberts v. State*, 458 P.2d 340, 346 (Alaska 1969).

Note, *supra* note 4, at 288 n.119. If this explanation is correct, then knowing participation requires knowledge that the judge before whom one is participating is the one to whom the case is permanently assigned or assigned for trial.

In *Riley v. State*, 608 P.2d 27, 29 (Alaska 1980), we held that knowing waiver requires that the party have the opportunity to consult with counsel before the time to exercise his challenge has expired.

**10.** While due process certainly does not require the essentially automatic disqualification right provided in AS 22.20.022 and Alaska R.Civ.P. 42(c), this court has recognized the due process values embodied in these provisions. *See, e. g., Kvasnikoff v. State*, 535 P.2d 464, 465 & n.3 (Alaska 1975); *In re G.K.*, 497 P.2d 914, 915 (Alaska 1972) (both cases discussing AS 22.20.-022).

**11.** Implicit in our holding is the conclusion that Niebert had the right to a peremptory challenge, since the consolidation here should not serve to deprive him of this substantive right. In *Veazey v. Veazey*, 560 P.2d 382 (Alaska 1977), this court recognized peremptory challenge rights in favor of a guardian ad litem appointed to represent a child in child custody proceedings. In *Veazey*, we held that the guardian ad litem had the same rights in that respect as the original parties in the action and that those rights attached when an order was entered formally appointing him guardian. *Id.* at 385. *See also* Annot., *Intervenor's Right to Disqualify Judge*, 92 A.L.R.2d 1110, 1112 (1963), which states:

> Once an application for leave to intervene has been granted, the intervenors are parties to the litigation and as such entitled to all rights enjoyed by parties to the record in the original action, including, according to the doctrine upheld by several decisions, the right to apply for disqualification of the judge.

Similarly, we have recognized the right to a peremptory challenge of a judge to whom one's case is reassigned. *See Priest v. Lindig*, 591 P.2d 1299, 1301 n.4 (Alaska 1979) (dicta). Niebert's status in this case cannot be fairly distinguished from these other contexts.

**12.** Alaska R.Civ.P. 42(c)(5) provides, in part:

> *Assignment of Action.* After a notice of change of judge is timely filed, the presiding judge shall immediately assign the matter to a new judge within that judicial district.

Therefore, if the notice of change of judge is timely and otherwise proper, the presiding judge has no discretion and must reassign the case to another judge. *See, e. g., Channel Flying, Inc. v. Bernhardt*, 451 P.2d 570, 574 & n.9 (Alaska 1969) where we described the effect of a timely peremptory challenge under AS 22.20.022:

> [T]he judge concerned is at once disqualified from acting as a judge in the particular action or proceeding. When he is disqualified

does not allow us to avoid reaching the merits of the case, since Tunley's status, under these circumstances, is not affected by our remand of Niebert's case due to the superior court's erroneous denial of Niebert's notice of change of judge.[13] We therefore turn to the substantive aspects of this appeal.

## II. DID THE ANCHORAGE SCHOOL BOARD HAVE THE AUTHORITY TO CLOSE THE WOODLAND PARK ELEMENTARY SCHOOL?

Tunley argued in his summary judgment memorandum that, pursuant to AS 14.14.-060(d) and AS 14.14.065, the Anchorage Municipal Assembly was the only local authority which had the power to close Woodland Park Elementary School. The superior court, in its conclusions of law, ruled in part that:

The decision to cease sending students to a particular elementary school site does not require action by a Municipal Assembly pursuant to AS 14.14.060(d) as made applicable to a municipality by AS 14.14.065, or through any other provision of state law or municipal charter or ordinance. To the contrary, the closures involved in the instant case involve essentially a decision relative to student as-

signment and reassignment, which decisions are committed by state statute and the Alaska Constitution to the local school boards through delegation by the legislature.

Tunley has specified this ruling as error. AS 14.14.060(d) provides:

The borough assembly shall determine the location of school buildings with due consideration to the recommendations of the borough school board.

As the superior court noted, this provision is also made applicable to the home rule Municipality of Anchorage in its relationship with the Anchorage School Board by AS 14.14.065.[14]

Tunley argues that if the municipal assembly is given the duty to "determine the location" of schools, it must be implied that this includes "the exclusive power to close" and "abandon" schools. Enumerating the other subject areas in which the municipal assembly has been given authority over the school board by the legislature,[15] Tunley concludes that the school board has no power to close schools and that the power is implied in the assembly's power to establish schools. We think that an explanation of the general Alaska scheme allocating edu-

he no longer possesses the qualities necessary to act as a judge, i. e., the qualities of power, capacity, fitness or competency to proceed further. In short, when a proper affidavit has been timely filed, the judge involved is without power or jurisdiction to take any further action in the proceeding. If this were not the intent and effect of the statute, then it would be meaningless and ineffective.

*Id.* at 574 (footnote omitted). *See also Hartford Accident & Indem. Co. v. State*, 498 P.2d 274, 275 (Alaska 1972); *Pope v. State*, 478 P.2d 801, 804 (Alaska 1970), *reh. denied*, 480 P.2d 697 (Alaska 1971). After the promulgation of Alaska R.Civ.P. 42(c) and Alaska R.Crim.P. 25(d), this court recognized the common law rule that a judge removed by a peremptory challenge can perform nondiscretionary or ministerial acts. *Gieffels v. State*, 552 P.2d 661, 666 (Alaska 1976). *Gieffels* modified the rule of *Channel Flying, Inc.* to allow a disqualified judge to take procedural or administrative action which does not interfere with the substantive rights of a defendant, thus upholding that part of Alaska R.Crim.P. 25(d) which provides that a disqualified presiding judge may contin-

ue to perform the functions of the presiding judge. 552 P.2d at 666–69. *See also Padie v. State*, 566 P.2d 1025, 1029–30 (Alaska 1977).

**13.** Tunley did not join in Niebert's application for change of judge, nor did he claim the issue as error on appeal. At oral argument, he admitted his time to challenge Judge Ripley had already passed. As to the issues raised in the municipality's cross-appeal, we need not address these because of the remand we have ordered.

**14.** That statutory section provides as follows:

*Relationship between city school district and city.* The relationships between the school board of a city school district and the city council and executive or administrator are governed in the same manner as provided in § 60 of this chapter for the school board of a borough school district and the borough assembly and executive or administrator.

**15.** See the provisions of AS 14.14.060, which is made applicable to the Municipality of Anchorage by AS 14.14.065, *supra* note 14.

cational authority suggests that the conclusion urged by appellees, and accepted by the superior court, is preferable.[16]

The Anchorage School Board was created by the authority of the state legislature, and is the delegated state authority to govern its school district and manage the operations of the schools within that district.[17] The number of members on the Anchorage School Board,[18] its powers and duties,[19] and its relationship with the municipal government[20] are typical matters resolved by Alaska statutes. While the school board is elected by the same voters as is the municipal assembly, and is also a part of the Municipality of Anchorage, it is a legislative body with legal responsibilities which in important respects are distinct from those exercised by the assembly.[21]

Nowhere is the independent status of the Anchorage School Board more apparent than in school system budgetary matters. The Anchorage Municipal Assembly and the School Board are required to hold joint conferences "at least four (4) times yearly in public session to discuss and coordinate financial planning, capital improvement needs, the comprehensive plan, and other matters of mutual concern." Anch. Mun.Charter § 6.04; Anch.Mun.Code § 29.-20.010. However, while the school board has an obligation to develop and submit to the municipal assembly a "proposed budget for the next fiscal year and a proposed six-year program for capital improvements and fiscal policies," Anch.Mun.Code § 29.-20.020, the assembly has no legislative power to make appropriations for specific items,

**16.** We are not concerned here with an actual effort by the municipality by ordinance or charter to control aspects of education other than as specifically authorized by the legislature. Accordingly, we are not confronted with an issue involving the extent of home rule powers under Alaska Const. Art. X, § 11, by which a home rule municipality "may exercise all legislative powers not prohibited by law or by charter." The school board does argue that § 17.05 of the Anchorage Municipal Charter (see sections IV and V, *infra*) could potentially be used by the assembly to unauthorizedly control such areas of education, an argument in which we see no merit for the reasons discussed in n.33, *infra*.

**17.** *See Macauley v. Hildebrand*, 491 P.2d 120, 122 (Alaska 1971). This delegation of authority is common:

Historically, Americans have considered schools to be an extension of the local community. Thus, although state legislatures possess plenary power over the educational system, local initiative with respect to education is so highly regarded that most states have delegated extensive authority over the actual administration of the schools to local institutions. States have divided their territory into "school districts" that perform the sole function of establishing and maintaining the public schools. Boards of education, commonly referred to as school boards, have been created as the governing body of the school district and are typically responsible for the day-to-day operation of the public schools.

Project, *Education and the Law: State Interests and Individual Rights*, 74 Mich.L.Rev. 1373, 1380 (1976) (footnotes omitted). *See also* 3A C. Antieau, Local Government Law § 30Q:5.01, at 30Q-44 to 30Q-46 (1979).

**18.** *See* AS 14.12.030(b) ("city school district with an average daily membership exceeding 5,000 has a school board of seven members"); Anch.Mun.Charter § 6.01 (seven person school board). *See also* AS 29.23.310 (providing basic requirements for election of school board members "unless a different election date or interval of years is provided by ordinance"). "Composition of the local school boards and their manner of election or appointment are regularly governed by statute." 3A C. Antieau, *supra* note 17, at 30Q-45. *See* AS 14.12.050 (school board terms); AS 14.12.070 (vacancies on school board); AS 14.12.090 (oath required of members).

**19.** *See, e. g.,* AS 14.14.090 (additional duties of school board).

**20.** *See* AS 14.14.060; AS 14.14.065.

**21.** The Anchorage School Board's plenary educational authority is recognized by the Anch. Mun.Charter § 6.03:

*Powers of the School Board.* The School Board has the powers provided by law, including but not limited to, the power to:
(1) formulate policy for the operation of the schools;
(2) appoint and provide for suspension and removal of school personnel, including the superintendent;
(3) serve as a board of personnel appeals;
(4) generally supervise School District fiscal affairs, including preparation and submission of the annual budget and six-year plan.

*See also* Anch.Mun.Code § 29.10.040 (reiterating these school board powers).

programs or priorities provided for by the school board's budget. Instead, "[t]he Assembly may increase or decrease the budget of the School District only as to total amount." Anch.Mun.Charter § 6.05(b); Anch.Mun.Code § 29.20.030.

This general absence of municipal assembly legislative appropriations power is particularly striking in light of the large proportion of municipal revenues devoted to the school system budget. *See* Anch.Mun. Code § 21.05.075A ("Nearly 70% of the local tax dollar now goes to elementary and secondary educational programs."). It is this budgetary and political reality which in all likelihood prompted the state legislature to give municipal assemblies certain powers with regard to school board budgetary and accounting processes in AS 14.14.060(a)–(c), and with regard to certain major capital expenditures for the design, construction, and repair of schools in AS 14.14.060(d)–(f). Among the latter areas of authority allowed, the assembly has the power, provided in AS 14.14.060(d), the breadth of which is in dispute in the case at bar, to determine the location of school buildings with due consideration to the recommendations of the . . . school board."

■ If seen in this perspective, the school board's argument in this case that AS 14.-14.060(d) only gives the municipal assembly the authority to initially determine the location of school buildings makes a great deal of sense. Since, as the school board concedes, the municipality, and not the school board, has the power to condemn property for use as a school site, the municipal assembly has a strong interest in and reason for making the decision as to school site selection. This is consistent with the municipality's exercise of eminent domain powers and its obligation to compensate the owners of property condemned for school

purposes.[22] To allow the municipal assembly to determine the site of schools to be built in AS 14.14.060(d) is also consistent with the succeeding subsections (e) and (f) of that statute, which grant the assembly decision-making power with respect to the plans and designs of schools to be constructed and "all major rehabilitation, all construction and major repair of school buildings."

This statutory consistency is not furthered by also inferring assembly power to determine which schools are to discontinue operations. The closure of a school does not involve the exercise of the municipality's eminent domain powers, nor does it involve major additional appropriations of municipal funds. Furthermore, in contrast to the municipal government's diminished fiscal and political interests, the school board has strong educational policy interests in deciding which schools are to be closed. This decision effectively determines the size, the design, and therefore the nature of the educational programs of the schools which remain open.

■ Similarly, as the school board argues, the closure decision involves questions of student assignment and attendance areas, which are certainly within the scope of school board authority, rather than that of the municipal assembly. In this regard, AS 14.12.020(b) provides:

> Each borough or city school district shall be operated on a district-wide basis under the management and control of a school board.

It is clear that pupil assignment and attendance area determinations may be made by a school board as a part of its "management and control" authority, subject to statutory and constitutional restrictions.[23] This as-

---

**22.** *See* AS 29.73.020 ("A home rule or general law municipality may exercise the powers of eminent domain . . . ."); AS 09.55.240(a)(3) (right of eminent domain may be exercised for "public buildings and grounds for the use of . . . [a] school district"). The procedures for exercising eminent domain powers are detailed in AS 09.55.290 to AS 09.55.460. *See also* Alaska R.Civ.P. 72. Article I, § 18 of the Alas-

ka Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." *See Greater Anchorage Area Borough v. 10 Acres*, 563 P.2d 269 (Alaska 1977).

**23.** *See, e. g., Older v. Board of Educ.*, 27 N.Y.2d 333, 318 N.Y.S.2d 129, 266 N.E.2d 812, 813 (N.Y.1971) ("It cannot be denied that the power

signment power extended to its logical conclusion—the closing of a school by not assigning any students to the particular school—provides an independent basis for the school board's closure authority in the case at bar.[24]

 Given the broad managerial mandate of the school board, and the limited authority of the municipal assembly in educational policy matters, we think that it is the school board which has the authority to decide whether schools should be closed.

III. *DID THE ANCHORAGE SCHOOL BOARD HAVE THE AUTHORITY TO CLOSE WOODLAND PARK ELEMENTARY SCHOOL WITHOUT COMPLYING WITH 4 AAC 05.090?*

In the superior court, Tunley argued that 4 AAC 05.090 required the school board to obtain the approval of the Alaska Department of Education before closing these schools. The superior court ruled that "[t]he school closures involved in this case did not require the prior approval of the Department of Education pursuant to 4 AAC 05.090 or otherwise."

The Alaska Constitution,[25] as interpreted by this court, provides a clear "mandate for pervasive state authority in the field of education."[26] The state agency which has been delegated the state's general authority in this regard is the Department of Education.[27] The governing body of this state department is the state Board of Education, which is empowered to promulgate any reg-

ulations which are necessary to carry out the state's educational mandate.[28]

It was pursuant to this regulatory power that the Department of Education promulgated 4 AAC 05.090, which provides:

*DISCONTINUATION OF SCHOOLS.* Once provision of a school in a community has been initiated by undertaking major renovation of an existing facility or construction of a new facility, that school may only be discontinued through action of the governing body of the district. Plans for discontinuation of a school under this section must be submitted to the department for approval and may not be executed until they are approved. Plans will be considered approved if the department does not disapprove them within 90 days after submission.

The flaw in Tunley's position is apparent when one examines the general scheme of the regulatory chapter of which 4 AAC 05.090 is a part. Chapter 05 of the Department of Education's regulations is entitled "LOCAL EDUCATION," and was promulgated with an effective date of September 3, 1976, to implement the state's policies, which were developed as a part of litigation on settlement in the *Hootch* case, on local education in rural communities. *See Hootch v. Alaska State-Operated School System,* 536 P.2d 793 (Alaska 1975). *See also Tobeluk v. Lind,* 589 P.2d 873, 875 (Alaska 1979). The purpose of chapter 05 is stated as follows:

The legislature shall by general law establish and maintain a system of public schools open to all children of the State . . . .

---

to assign pupils to schools within the district is a power that is 'reasonably necessary' to the management and control of the educational affairs of the district."). *also* AS 14.14.110; AS 14.14.120.

**24.** *See Wells v. Board of Educ.,* 289 S.W.2d 492, 494 (Ky.App.1956) (authority to transfer children to other subdistricts interpreted to allow discontinuance in school). *See also* 2 E. Yokley, Municipal Corporations § 388, at 313 (1957) (where authorized by statute, board may abandon and close a school and order students to transfer to another school).

**25.** Alaska Const. Art. VII, § 1 provides, in part:

**26.** *Macauley v. Hildebrand,* 491 P.2d 120, 122 (Alaska 1971). *See* AS 14.03.010 (establishing "in the state a system of public schools to be administered and maintained as provided in this title").

**27.** *See* AS 14.07.010; AS 14.07.020.

**28.** *See* AS 14.07.075 (creating Board of Education consisting of seven members); AS 14.07.-060 (requiring Board of Education to promulgate regulations "necessary" to implement state educational policy). *See also* AS 14.07.-020 (duties of Department of Education).

4 AAC 05.010. *PURPOSE.* (a) The purpose of this chapter is to ensure that, consistent with the desires of parents and of local communities, the school-age children in the State of Alaska have the opportunity to attend an elementary or secondary school in the local communities in which they reside.

(b) Nothing in this chapter is intended to require the construction of a new facility in which to conduct a school established pursuant to this chapter, if there exists in the community a suitable facility in which the school may be conducted.

While "community" is broadly defined to include "a home-rule city, city of any class, and incorporated and unincorporated villages," 4 AAC 05.020, the apparent focus of these regulations is on the provision of local schools in rural Alaska based on the following principle:

4 AAC 05.030. *LOCAL EDUCATION.* (a) Every child of school age has the right to a public education in the local community in which he resides.

(b) Neither the department nor the district may require a child to live away from the local community in which he resides to obtain an education.

Accordingly, the regulations of the chapter are addressed to: establishing schools or school programs in communities in which a threshold number of children available to attend such schools resides; delineating the power of local school committees and school district governing boards in the process by which local schools are to be established; providing time requirements and exceptions thereto for this process of establishing local schools; and setting standards and procedures on such matters as program planning and evaluation, school curriculum, and personnel.

■■■■■ Read in the context of this chapter's sole purpose of establishing local, rural community school services, the requirement of state approval prior to "discontinuation of schools" of 4 AAC 05.090 would seem to be imposed on a more narrow class of schools than Tunley suggests; it would seem to be directed only at local, predominantly rural schools established pursuant to the regulatory chapter of which it is a part. We find this is the most sensible interpretation and apparently is the interpretation placed on 4 AAC 05.090 by the state Department of Education,[29] which makes this case a most appropriate one for adhering to the oft-stated rule that a reviewing court will give deference to an agency's interpretation of its own regulations.[30] Since the closure of the Woodland Park Elementary School did not interfere with the stated purpose of chapter 05 of providing local education, *see* 4 AAC 05.030, we hold that 4 AAC 05.090 does not require State Department of Education approval of that closure action by the Anchorage School Board. Thus, we conclude that the superior court did not err in so deciding this issue.

29. In an April 16, 1979, letter from Anchorage School Superintendent John Peper to State Commissioner of Education Marshall Lind, Peper inquired whether 4 AAC 05.090 applied "to the closure of locally constructed schools built by a city or borough school district prior to the adoption of 4 AAC 05.090 in 1976." Lind replied in a letter dated April 20, 1979:

The department is not prepared to address the retroactive effect, if any, of 4 AAC 05.090. Nevertheless, it is my view, concurred in by the Department of Law, that 4 AAC 05.090 is inapplicable to the closures of Woodland Park Elementary School and the Government Hill Elementary School since 4 AAC Chapter 5 requires prior approval of the department only where closure necessitates a child attending the school subject to closure to live away from the local community in which he or she resides in order to obtain an education.

30. *See, e. g., Department of Highways v. Green,* 586 P.2d 595, 602 n.21 (Alaska 1978), in which we stated:

An administrative agency's interpretation of its own regulation is normally given effect unless plainly erroneous or inconsistent with the regulation. 1A C. Sands, Sutherland Statutory Construction § 31.06, at 362 (4th ed. 1972). *See Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616, 619 (1965); *Burglin v. Morton,* 527 F.2d 486, 490 (9th Cir. 1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976).

## IV. WAS THE ASSEMBLY OF THE MUNICIPALITY OF ANCHORAGE REQUIRED BY SECTION 17.05 OF THE ANCHORAGE MUNICIPAL CHARTER TO ADOPT A PROCEDURE FOR PUBLIC NOTICE OF THE SCHOOL BOARD MEETING?

The next issue is whether the superior court erred in not holding that Section 17.05 of the Anchorage Municipal Charter required the assembly to adopt procedures for reasonable public notice of school board meetings, and that the adoption of school closure recommendations was invalid in the absence of such regulations.[31] The full text of section 17.05 is:

(a) All meetings of the Assembly, the School Board and other boards and commissions shall be public. The Assembly by ordinance shall adopt procedures for maximum reasonable public notice of all meetings. At each such meeting the public shall have reasonable opportunity to be heard. An executive session may be held to discuss pending litigation or any matter the immediate public knowledge of which would tend to affect adversely the finances of the municipality or to defame or prejudice the character or reputation of any person. The general matter for consideration in executive session shall be expressed in the motion calling for the session. No official action may be taken in executive session.

(b) Except in emergency, the Assembly, School Board, and all municipal boards and commissions may take no official action between the hours of twelve midnight and 7:00 o'clock a. m., actual time. Action taken in violation of this paragraph is void.[32]

Both Tunley and the school board rely on only the first two sentences of part (a). Tunley argues that the requirement that the assembly adopt procedures for public notice for "all meetings" in the second sentence applies to the "Assembly, the School Board, and other boards and commissions" mentioned in the first sentence of the statute. The school board argues that, on the contrary, the requirement of adoption of an ordinance for public notice applies only to the assembly's meetings, and not to those of the school board and other commissions.

The first sentence of Section 17.05 clearly establishes that all meetings of the assembly, school board, and other commissions shall be public. However, the "all meetings" clause in the second sentence is ambiguous; it could reasonably require the assembly to adopt an ordinance for public notice of every board's or commission's meeting or only those of the assembly.

 Section 17.05 of the Anchorage Municipal Charter applies to all public meetings, not just those of the assembly. The "all meetings" in the first sentence clearly applies to meetings of the school board. The normal construction of the "all meetings" in the second sentence, considered in the context of the entire section on public meetings, would include the school board and other commissions in its procedural requirement of proper notice. If only the assembly was to be governed by the sentence, this could have been made clear by use of the word "its" rather than "all." The more comprehensive interpretation is strengthened by the third sentence, which reads, "[a]t each such meeting the public shall have reasonable opportunity to be heard." If the school board's interpretation of the statute is accepted, then "each such meeting" would logically apply only to assembly meetings. We think that the opportunity for public hearing was intended to apply to every public body, including the school board, and this requires that "all meetings" in the second sentence be inclu-

---

**31.** Although this issue was originally raised by Niebert, we note that Tunley did object to the conclusions of law of the superior court judge on this point. Since the cases were consolidated, since both the judge below and appellee on appeal had a chance to address the issue due to Niebert's raising it, and since we regard § 17.05 as a preferable ground of decision to the due process argument raised by Tunley, we choose to address the point here.

**32.** This identical provision is in § 1.25.010 of the Anchorage Municipal Code.

sive rather than exclusive. Thus, we conclude that Tunley's interpretation of Section 17.05 of the Charter is the more reasonable one.

▇▇ The school board argues, in the alternative, that the assembly fulfilled its responsibility to enact an ordinance for notice of school board meetings by enacting Municipal Code § 29.10.040, which provides in part:

The School Board has the powers provided by law, including but not limited to, the power to:

A. Formulate policy for the operation of the schools.

However, this ordinance does not specify any procedure for public notice and thus does not fulfill the requirement for adoption of public notice procedures mandated by Section 17.05 of the Charter.

▇▇ Since we have found that the assembly had the duty to enact an ordinance for public notice of school board meetings, and failed to do so, the issue is whether the assembly's failure is critical to the adoption by the Anchorage School Board of the closure plan. The Anchorage School Board did in fact establish detailed meeting times for board meetings, and the school closure debate and decision was accompanied by extensive publicity and media coverage. If in fact ample notice was given by the school board, the failure of the assembly to pass the required ordinance would not be fatal to the validity of the school closure.[33] In that event the underlying purposes of § 17.05 of the charter—ensuring "maximum reasonable public notice" of all meetings and affording the public a "reasonable opportunity to be heard"—will have been satisfied. We turn next to the question of whether such notice was given.

## V. WAS APPROPRIATE PUBLIC NOTICE OF SCHOOL BOARD'S MEETING CONCERNING THE SCHOOL CLOSURES GIVEN?

The relevant facts pertaining to this question are as follows. The issue of school closure first arose in December 1978, when the administration submitted to the Anchorage School Board a draft Capital Improvement Plan for 1979 through 1985. School closure was mentioned as one option, because of excess classroom capacity and budgetary pressures. The Capital Improvement Plan was considered by the school board on January 17, 1979, at a work session. On February 15, 1979, in a public meeting, the school board voted to close two elementary schools for the 1979–80 school year. On February 15, there existed a list of schools which might be closed, but no definite recommendations had been made. This list included Woodland Park Elementary School and Government Hill. In its regular February 19 meeting, the school board directed the administration to prepare recommendations on specific schools amenable to closure by March 12, 1979. This decision was widely reported in the local media. The schools recommended to be closed, Woodland Park and Government Hill, were publicly disclosed on March 7, 1979, five days before the school board's March 12 meeting, and were published in local papers. The agenda for the March 12 meeting, which indicated that consideration of the closure recommendations would occur at that time, was also publicized. At the public meeting of March 12, the Anchorage

---

**33.** The school board argues that, under appellant's interpretation of § 17.05, the assembly could, by refraining from adopting an appropriate ordinance, totally frustrate the school board's ability to take action on any subject, in violation of state law. *See Macauley v. Hildebrand*, 491 P.2d 120 (Alaska 1971). However, implicit in our discussion of the reasonableness of the five-day notice actually given by the school board is the premise that, were the actual notice given sufficiently detailed and timely in relation to the meeting, the purposes of § 17.05 would be served whether or not the assembly actually passed the ordinance. As such, any party would be unable to show the requisite prejudice stemming from the assembly's failure to pass an ordinance, and thus the board's actions would not be invalid on that ground. We thus reject the suggestion that the assembly could effectively paralyze the board by refusing to pass the required statute.

School Board adopted the administration's recommendation of closing Woodland Park and Government Hill.[34] Thus, there was a five-day period between the announcement of the probable closure of the Woodland Park and Government Hill schools and the final adoption of the closure plan.

Determination of this last remaining issue depends on whether the five day notice provided by the school board fulfills the expressed purposes of § 17.05 of the charter in the context of this case.

■ In light of the impact any closure decision would have on both the child's and parent's interests in the maintenance of neighborhood schools, any closure decision should have been preceded by a public school board meeting at which those potentially affected were given sufficient notice in order to enable adequate preparation and presentation of their views. While the school board, at its February 15 meeting had given notice that it would consider at its next meeting on March 12 the possible closure of schools and that specific recommendations were to be made by the administration at that time, there was only five days notice to interested residents and parents of exactly which schools were strongly recommended for closure by the administration.

■ Five days is not sufficient time for appropriate preparation of opposition concerning an issue of this complexity and importance. Further, such short notice lessens the likelihood of a fair hearing before the school board and of the school board reaching a reasoned administrative decision. For these reasons we conclude that the five-day notice given did not satisfy the purposes of § 17.05 of the charter.[35]

Since our holding is that the five-day notice was insufficient, this case is remanded to the superior court with directions to remand to the school board to conduct the public hearing after adequate notice.[36]

As to Tunley, we Affirm in part, Reverse in part, and Remand for further proceedings in conformity with the foregoing.

As to Niebert, the superior court's grant of summary judgment is Reversed and Vacated and the matter Remanded to the superior court for further proceedings and reassignment to a different superior court judge.

BOOCHEVER, J., not participating.

34. In summary, the timing of the process was:

1. December, 1978 — Submission to board of draft Capital Improvement Plan
2. January 17, 1979 — Special board work session to consider plan
(29 days)
3. February 15, 1979 — Board voted to close two elementary schools for 79–80 year
(4 days)
4. February 19, 1979 — Board directed administration to prepare recommendations on closure
(16 days)
5. March 7, 1979 — Closure recommendations made public
(5 days)
6. March 12, 1979 — Closure recommendations for Woodland Park and Government Hill adopted by the school board

35. Implicit in this is our conclusion that the notice required by Section 17.05 includes reasonable notice of the subject of each meeting. Without such a requirement the public can hardly be said to have been afforded "a reasonable opportunity to be heard" as required by the charter. As Antieau states:

It is the general rule that a required notice of meeting should unambiguously set forth reasonable information concerning the subject matter of the meeting to the end that adequate warning be given to all persons whose rights and interests may be affected by action of the local governing body.

1 C. Antieau, Municipal Corporation Law § 4.02 at 4–7 (1980).

36. We have examined Tunley's claim of discrimination against his child because of race and have concluded that this claim is without merit. Similarly, we are of the view that Tunley's assertion that there existed genuine issues of material fact which prevented entry of summary judgment is also lacking in merit.