ANCHORAGE INDEPENDENT LONG-SHORE UNION LOCAL 1, Appellant,

v.

The MUNICIPALITY OF ANCHORAGE, the Anchorage Port Commission, William D. McKinney, Port Director, and Odom Corporation, d/b/a Anchorage Cold Storage Co., Inc., Appellees.

No. 6717.

Supreme Court of Alaska.

Nov. 10, 1983.

Ann K. Stokes and John H. Bradbury, Bradbury, Bliss & Riordan, Anchorage, for appellant.

Julie Garfield, Deputy Mun. Atty., and Jerry Wertzbaugher, Mun. Atty., Anchorage, for appellees Municipality, Anchorage Port Com'n, and McKinney.

Michael W. Dundy and Richard H. Foley, Jr., Bogle & Gates, Anchorage, for appellee Odom Corp.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Chief Justice.

This case involves the issuance of a Port of Anchorage terminal use permit to the Odom Corporation, doing business as Anchorage Cold Storage (Odom). Odom's permit allows it access to the public dock at the Port of Anchorage to unload and obtain possession of its goods upon their arrival, by barge, at the Port. The Anchorage Independent Longshore Union Local No. 1 (Union) is a current permit holder under a union contract, and its members challenge the validity of Odom's permit. We reverse the superior court's decision granting summary judgment to Odom and the Municipality of Anchorage.

## I

Odom is a local distributor that formerly had a collective bargaining agreement with Teamsters Local 959. When negotiations for a new contract between the parties broke down in June of 1981, Local 959 commenced a strike against Odom. The strike included a boycott of products distributed by the company and daily picketing at all retail outlets carrying those products. In addition, the Teamsters' picket line led to a refusal by common carriers to haul Odom's goods from Seattle to Anchorage, which prior to the labor dispute were transported through the Port by Union longshoremen. Odom, thereby, was required to charter a barge to haul its goods to Anchorage, and to use non-union employees as longshoremen.

In late September of 1981, Odom contacted the Municipality to obtain a permit to land the barge at Anchorage and, using non-union employees, unload its goods. Mayor George Sullivan requested advice from Chief Administrative Officer Ron Garzini with respect to Odom's use of Port facilities. Garzini advised that because of the public nature of the dock, there was no reason to deny access, especially in light of Union's refusal to unload Odom's goods. After the Port Manager confirmed his advice, Garzini with the assistance of the Municipality's legal office, authorized the preparation of the permit granting Odom access to the Port solely for the purpose of offloading its goods. The barge was expected to arrive in Anchorage within a few days.

Two provisions of Terminal Tariff No. 2 provide for the issuance of terminal use permits. Part 120 allows authorization by

the Port Director[1] and Part 215 allows for issuance by the Port Commission.[2] Purportedly pursuant to Part 120, on October 2, 1981, Municipal Manager John Valensi executed the Odom permit authorizing access to the Port.

The Odom barge was delayed due to mechanical difficulties and did not arrive until late October. As a result of this delay, James Dunn, Director of Transportation, and Chris Gates, Acting Port Director and Manager of Marketing and Development, received clearance to present the Odom permit to the Port Commission for its consideration and approval. Because of the late date decision to go before the Port Commission, the Commission agenda for the regularly scheduled October 21 meeting did not include an express reference to the Odom permit. Instead the permit was proposed and discussed as an item among those designated: "items not on the Agenda." Union business agent Bud Kowalski, having been informed that the Odom permit might be discussed at the meeting, was present and took the opportunity to address the Commission regarding the permit.

Union filed suit against the Municipality on October 29, 1981, seeking a temporary restraining order and a preliminary injunction to invalidate Odom's authorized permit for use of the Anchorage Port. The superior court denied Union's request for a temporary restraining order on the grounds that it had not shown irreparable harm or a probable success on the merits.

Odom filed a motion to intervene as a defendant. In addition, it filed its opposition to Union's motion for a preliminary injunction and included its own motion for

summary judgment. On February 9, 1982, after a hearing and oral arguments, the superior court granted summary judgment to the Municipality and Odom without opinion. This appeal followed. We reverse.

## II

■ The Municipality and Odom argue that Union lacks standing to pursue this appeal. This court has repeatedly stated that the purpose of the standing requirement is to assure that there will be sufficient adversity to produce genuine litigation of the issue in controversy. *Wagstaff v. Superior Court,* 535 P.2d 1220, 1225 (Alaska 1975); *see also Public Defender Agency v. Superior Court,* 584 P.2d 1106, 1108 (Alaska 1978) (adversity is the essence of the requirement of standing); *Moore v. State,* 553 P.2d 8, 25 (Alaska 1976) (the only relevant inquiry in determining the question of standing is adversity).

Union is suffering competitive injury since the effect of its strike was significantly diminished once Odom was permitted to handle its own goods. This alone, we believe, is sufficient injury in fact to assure the degree of adversity that is essential to the concept of standing. *Compare Sisters of Providence v. Department of Social Services,* 648 P.2d 970 (Alaska 1982) with *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351 (Alaska 1971).

## III

■ On the merits, we hold that there were genuine issues of fact that precluded entry of summary judgment in favor of Odom and the Municipality.[3] Those issues

1. Port of Anchorage Terminal Tariff No. 2, Part 120(a) provides:
   No persons other than employees of the holders of authorized Terminal Use Permits shall be permitted to perform any services on the wharves or premises of the Port of Anchorage, operated under the authority of the Port Commission of the Port of Anchorage, except upon written authorization of the Port Director.

2. The alternate method of issuing permits is provided for in Terminal Tariff No. 2, Part 215(d):

   The services of handling, carloading, car unloading and other terminal services not specified herein, are provided by independent agents at the Port of Anchorage under Terminal Use Permits issued by the Anchorage Port Commission. These permits are available to any qualified agent desiring to provide longshoring services at the Port of Anchorage.

3. Summary judgment is appropriate only in those cases where it has been demonstrated "that there is no genuine issue as to any material fact and that [a] party is entitled to judg-

include whether there was compliance with Terminal Tariff No. 2 and whether the Port Commission's later ratification of the permit complied with the requirements of AS 44.62.310 and § 1.25.010 of the Anchorage Municipal Code.

### A. The Scope and Proper Application of Parts 120 and 215 of Tariff 2.

Although the construction of the tariff provisions might appear at first glance to be a question of law, appropriate for determination on summary judgment, we believe this is not the case. Testimony regarding the administrative interpretation of these regulations is important to their interpretation by the courts. *Tunley v. Municipality of Anchorage School District*, 631 P.2d 67, 78 n. 30 (Alaska 1980); *State, Department of Highways v. Green*, 586 P.2d 595, 602 n. 21 (Alaska 1978); *Absher v. State*, 500 P.2d 1004, 1005 (Alaska 1972). Thus, the interpretation of the scope of the provisions is a mixed question of law and fact, inappropriate for summary disposition. For instance, it must be determined which part of Tariff 2 Odom relied upon in arguing that it was authorized to offload its goods; whether Part 120 may be used to authorize activities addressed in Part 215; whether only the Port Commission is permitted to issue permits pursuant to Part 215 (assuming Part 120 would not be applicable); whether the Commission may exercise discretion in issuing permits pursuant to Part 215; and whether it abused any discretion it does enjoy by granting a permit to Odom (i.e. whether Odom was a qualified stevedoring operation).

Although the Municipality and Odom strenuously argue that these are questions of law rather than fact, we are persuaded that they cannot be disposed of on the basis of the record before this court. For example, the Municipality asserts that "[i]ssuance of a Terminal Use Permit or similar authority is a routine operational function at the Port. Such an application has never been denied." For this assertion, the Municipality cites the Port Director's testimony that *to his knowledge* no permit application had been denied. Union, however, points out that permit approval was hardly routine—only seven permits had been approved in a five-year period, according to the Port Director—and that the Commission asked "very searching questions" when confronted with an unusual application. Similar disputes surround the other issues listed above.

### B. Did the Commission's Approval of the Odom Permit Violate the Alaska Public Meetings Statute and Anchorage Municipal Code?

Union argues that discussion of the Odom permit at the October 21, 1982 Port Commission meeting, without specific reference to that item on the official agenda, violated AS 44.62.310, part of the Alaska Public Meetings Act, and § 1.25.010 of the Anchorage Municipal Code.[4] These circumstances, Union contends, are nearly identical to those condemned by this court in *Tunley v. Municipality of Anchorage School District*, 631 P.2d 67 (Alaska 1981). The Municipality concedes that the provisions cited are applicable, but argues that *Tunley* is inapposite on several grounds. This debate raises numerous issues of fact.

---

ment as a matter of law." Alaska R.Civ.P. 56(c).

4. AS 44.62.310 provides:
   a. All meetings of a . . . commission . . . of the state or any of its political subdivisions, including, but not limited to municipalities . . . are open to the public except as otherwise provided in this section.
   . . . .
   e. Reasonable public notice shall be given all meetings required to be open under this section.

   f. Action taken contrary to this section is void.
   Anchorage Municipal Code § 1.25.010 similarly provides:
   All meetings of the assembly, the school board and other boards and commissions shall be public. The assembly by ordinance shall adopt procedures for maximum reasonable public notice of all meetings. At such meeting, the public shall have reasonable opportunity to be heard.

In *Tunley,* this court held that § 17.05 of the Anchorage Municipal Charter, a provision identical to § 1.25.010 of the Anchorage Municipal Code,[5] required agencies to give reasonable advance notice of the subject of each meeting. 631 P.2d at 81 n. 35. The timing and specificity of "reasonable notice" is necessarily dependent upon the complexity and importance of the issue involved. Union contends that the absence of the Odom permit among those topics mentioned in the agenda for the October 21, 1982, meeting constituted a violation of the "reasonable notice" requirement. Pointing out that even the Commissioners did not receive a copy of the Odom permit before the meeting, Union cites testimony indicating that at least one Commissioner would have been interested in pursuing differences[6] between the Odom permit and standard form permits, had he been apprised of them at that time. Union argues that it was precluded from making a meaningful presentation regarding such matters because of insufficient prior notice. It also contends that the lack of notice impinges upon due process rights.

The Municipality and Odom vigorously assert that proper notice was given. They contend that the matter was "simple," permit approval "pro forma" and "ministerial," and that the public had notice that matters other than those on the agenda might be discussed since the agenda included a reference to "items not on the agenda." Finally, relying upon *North State Telephone Co. v. Alaska Public Utilities Commission,* 522 P.2d 711 (Alaska 1974),[7] they argue that the

presence of Union's business agent "cured" any deficiencies in the notice given; Union's agent learned of the meeting the day it was held and did, in fact, attend and testify. However, whether such notice should be deemed to satisfy the requirements of *Tunley,* or whether any deficiency was cured under *North State,* involves issues of fact which must be determined on remand.

REVERSED and REMANDED.

MOORE, J., not participating.

---

5. *See Tunley,* 631 P.2d at 79 n. 32.

6. The Odom permit differed from the standard form permit in that it did not contain the following provision:
    *Section 9. Work Conditions; Labor Contracts.*
    A. The terms of the current applicable labor agreement, as it may be amended during the term of this permit, shall govern hours of labor, overtime compensation, and other working conditions for the Permittee's employees.
    B. The Permittee shall provide the Port Director with one (1) copy of all labor agreements applicable to its performance under this permit.

C. The Permittee shall use its best efforts to achieve work conditions and labor gang size at the Port which are better than or equal to those prevailing at other ports in Southcentral Alaska. The Permittee shall use its best efforts to provide longshore services at the lowest possible price.

7. In *North State,* the court held that "the question [regarding sufficiency of administrative notice] is whether the complaining party had sufficient notice and information to understand the nature of the proceeding ... [since] defects in administrative notice may be cured by other evidence that the parties knew what the proceedings would entail." 522 P.2d at 714.