MUNICIPALITY OF ANCHORAGE,
Appellant,

v.

John REPASKY, Jr., Nathan L. Powell,
Sandra A. Groeneveld, and Joseph D.
Brammer, individually and each as the
parent and representative of a minor
child, Appellees.

Municipality of Anchorage, Appellant,

v.

Sharon Long, Appellee.

No. S–8985.

Supreme Court of Alaska.

Oct. 26, 2001.

⊙═592(1)

William A. Greene, Deputy Municipal Attorney, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellant.

John E. Havelock, Anchorage, for Appellees John Repasky, Jr., Nathan L. Powell, Sandra A. Groeneveld, and Joseph D. Brammer.

Joe P. Josephson, Josephson & Associates, Anchorage, for Appellee Sharon Long.

Howard S. Trickey and Andrena L. Stone, Jermain, Dunnagan & Owens, P.C., Anchorage, for Amicus Curiae Anchorage School District.

Before MATTHEWS, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

In 1995 and again in 1997, after the Anchorage Assembly enacted ordinances for the Anchorage School District's annual budgets and for the local source appropriations for those budgets, Anchorage Mayor Rick Mystrom invoked the item veto power and reduced the total amount of each budget and local source appropriation. Was this a valid exercise of the mayor's veto power? We hold that it was. We conclude that the item veto power granted by the Anchorage Municipal Charter extends to the assembly's school district budget and local source appropriation ordinances. We also conclude that Alaska law does not prevent home rule municipalities from granting this power to their mayors. We therefore reverse the superior court decision which held that the charter does not confer this power on the Anchorage mayor.

### II. FACTS AND PROCEEDINGS

These appeals concern the process used to determine the Anchorage School District's budgets and local source appropriations for 1995–96 and 1997–98. Anchorage is a home rule municipality.[1] Per the Alaska Statutes, the Anchorage Municipal Charter, and the Anchorage Municipal Code, the Anchorage School Board must submit the school district's annual budget to the Anchorage Municipal Assembly for approval.[2] The assembly may approve, reduce, or increase the total amount of the school budget and the amount of the local contribution to the school budget,[3] but it may not modify individual items within the budget.[4] If the assembly does not act within thirty days, the school board's budget proposal becomes the school district's budget and local source appropriation without further assembly action.[5]

In February 1995 the school board submitted a proposed school district budget of about $353 million for the 1995–96 school year, about $87 million of which was to be appropriated from local sources. On March 28, 1995, the assembly enacted Anchorage Ordinance (AO) 95–60, which reduced by exactly $1 million dollars both the total amount of the district's proposed budget and the amount to be appropriated from local sources. On April 3 Mayor Rick Mystrom took what he termed a "line item veto action" and reduced the total amounts of the budget and the local source appropriation as approved by the assembly by an additional $2,344,430. The assembly's attempt to override the veto failed. The 1995–96 school district budget was accordingly reduced to about $350 million, about $84 million of which was appropriated from local sources.

The events in 1997 were similar. The school board sent the assembly a proposed budget of about $362 million for the 1997–98 school year, about $100 million of which was to be appropriated from local sources. A week later the assembly enacted AO 97–49, which reduced by exactly $1 million both the district's proposed budget and the proposed local source appropriation. Three days later the mayor exercised what he called his "line item veto" power and reduced by a further $2 million both the total budget and the local source appropriation. No motion to override this veto was presented to the assembly for consideration. The 1997–98 school budget was accordingly reduced to about $359 mil-

---

1. Anchorage Municipal Charter art. III, § 3.01; see also Area G Home & Landowners Org. v. Anchorage, 927 P.2d 728, 729 & n. 1 (Alaska 1996).

2. AS 14.14.060(c); Charter art. VI, § 6.05; Anchorage Municipal Code (AMC) §§ 6.10.050, .080.

3. AS 14.14.060(c); Charter art. VI, § 6.05(a); AMC § 06.10.050. The state contributes a large part of the budget of each school district; the

municipality contributes the remaining amount from "local sources." See AS 14.14.060(c); AMC §§ 6.10.050, .080(B).

4. AS 14.14.060(c) ("the assembly shall determine the total amount of money to be made available from local sources for school purposes"); Charter art. VI, § 6.05(b) ("The assembly may increase or decrease the budget of the school district only as to total amount.").

5. See AS 14.14.060(c).

lion, about $100 million of which was appropriated from local sources.

This litigation began when John Repasky Jr., and others, who had sued the Anchorage School District about another dispute, amended their complaint, challenging the mayor's authority to veto the district's 1995–96 and 1997–98 budgets. Both sides moved for summary judgment on the issue of the mayor's veto authority. While that action was proceeding, Sharon Long sued the municipality to challenge the 1997 veto.

The superior court consolidated the cases for oral argument and entered a decision resolving both cases. It ruled that the mayor did not have authority to veto the assembly's total school budget or the local source appropriation for the school budget. The municipality appealed in both cases and we consolidated the cases on appeal. The parties permitted the school district to file an amicus brief.[6]

## III. DISCUSSION

May the Anchorage mayor veto or reduce the total amounts of the assembly's school budget and local source appropriation ordinances? We first consider whether the Anchorage charter grants the mayor any veto power over school budget and local source appropriation ordinances. If it does, we must then consider whether that power is "substantially irreconcilable" with the state education scheme reflected in Alaska law.

### A. Standard of Review

We review grants of summary judgment de novo and will affirm if there are

6. Alaska R.App. P. 212(c)(9).

7. *Taranto v. North Slope Borough*, 909 P.2d 354, 355 (Alaska 1996).

8. *Fancyboy v. Alaska Village Elec. Coop., Inc.*, 984 P.2d 1128, 1132 (Alaska 1999).

9. *Area G Home & Landowners*, 927 P.2d at 731.

10. Alaska Const. art. X, § 2.

11. Alaska Const. art. X, § 9.

12. Alaska Const. art. X, § 11.

13. Charter art. III, § 3.01; *see also Area G Home & Landowners*, 927 P.2d at 729.

no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.[7] We apply our independent judgment when interpreting the Alaska Statutes.[8] Because the municipality's charter is a constitutional document [9] and its code is a statutory document, we apply our independent judgment in interpreting the charter and code.

### B. Overview of the Mayoral Veto Power and the School Budget Process

#### 1. Local government and the mayoral veto

The Alaska Constitution vests "all local government powers" in boroughs and cities.[10] It authorizes the voters of a first class city or borough to adopt a home rule charter [11] and provides that "[a] home rule borough or city may exercise all legislative powers not prohibited by law or by charter." [12] Title 29 of the Alaska Statutes delineates both the powers and structures of local governments.

The Municipality of Anchorage is a home rule municipality.[13] It was incorporated as a unified municipality in September 1975, when voters adopted by referendum its constitutional document, the Home Rule Charter for the Municipality of Anchorage.[14] Its executive and administrative power is vested in the mayor.[15] Its legislative power is vested in the assembly.[16] Since 1990 subsection 5.02(c) of the charter has expressly granted the mayor both a general and a "line item" veto power.[17]

14. *Area G Home & Landowners*, 927 P.2d at 729. Creation of the municipality united the former City of Anchorage and the Greater Anchorage Area Borough. *Id.; see also* Charter art. I, § 1.02.

15. Charter art. V; *see also* AS 29.20.220, .250.

16. Alaska Const. art. X, § 4; Charter art. IV, § 4.01.

17. Subsection 5.02(c) provides in pertinent part:

The mayor has the veto power. The mayor also has line item veto power. The mayor may, by veto, strike or reduce items in a budget or appropriation measure.

As we will see, it is important to the outcome of these cases that Anchorage is a home rule municipality.

### 2. *The education budget process*

Article VII, section 1 of the Alaska Constitution mandates that "[t]he legislature shall by general law establish and maintain a system of public schools open to all children of the state...." To this end, Title 14 of the Alaska Statutes creates Alaska's public education system.[18] The legislature delegated the state's authority to manage the operations of the schools to local school districts.[19]

The Anchorage School District is geographically coextensive with the Municipality of Anchorage.[20] The municipality, as required by statute,[21] established the Anchorage School Board[22] and charged it with operating the municipality's schools.[23] Although the school board is elected by the same voters who elect the municipal assembly, and is part of the municipality, "it is a legislative body with legal responsibilities which in important respects are distinct from those exercised by the assembly."[24] Further, while the legislature has delegated significant local control over education, this court has made it clear that the Alaska Constitution mandates "pervasive state authority in the field of education."[25]

The relationship between the school board and the assembly in the school district budget process is established by AS 14.14.060,[26] which corresponds to Anchorage charter section 6.05[27] and Anchorage Municipal Code section 6.10.050. These provisions require the school board to submit the district's annual budget to the assembly for approval.[28] Within thirty days after receiving the budget, the assembly may approve, reduce, or increase the total amount of the district's budget.[29] The assembly may modify the budget

**18.** AS 14.03.010 (establishing "in the state a system of public schools to be administered and maintained as provided in this title"); *see generally Tunley v. Municipality of Anchorage Sch. Dist.*, 631 P.2d 67, 74–77 & n. 26 (Alaska 1980).

**19.** AS 14.12.020(b); AS 29.35.160.

**20.** AS 14.12.010; AS 29.35.160(a).

**21.** AS 29.35.160.

**22.** Charter art. VI, § 6.01; AMC § 29.10.010.

**23.** Charter art. VI, §§ 6.01 & 6.03; AMC § 29.10.010.

**24.** *Tunley*, 631 P.2d at 75; *see also* Charter art. VI, § 6.03 (delineating powers of school board).

**25.** *Macauley v. Hildebrand*, 491 P.2d 120, 122 (Alaska 1971).

**26.** AS 14.14.060 is made applicable to home rule municipalities (like Anchorage) by AS 14.14.065, which provides in pertinent part:

The relationships between the school board of a city school district and the city council and executive or administrator are governed in the same manner as provided in AS 14.14.060 for the school board of a borough school district and the borough assembly and executive or administrator.

AS 14.14.060(c) provides:

Except as otherwise provided by municipal ordinance, the borough school board shall submit the school budget for the following school year to the borough assembly by May 1 for approval of the total amount. Within 30 days after receipt of the budget the assembly shall determine the total amount of money to be made available from local sources for school purposes and shall furnish the school board with a statement of the sum to be made available. If the assembly does not, within 30 days, furnish the school board with a statement of the sum to be made available, the amount requested in the budget is automatically approved. Except as otherwise provided by municipal ordinance, by June 30, the assembly shall appropriate the amount to be made available from local sources from money available for the purpose.

**27.** Charter § 6.05(c) tracks the language of AS 14.14.060(c), and provides:

The assembly shall approve the budget of the school district as amended and appropriate the necessary funds at least 60 days prior to the end of the fiscal year of the school district. If the assembly fails to approve the school district budget and make the necessary appropriation within the time stated, the budget proposal shall become the budget and appropriation for the fiscal year of the school district without further assembly action.

**28.** AS 14.14.060; Charter art. VI, § 6.05; AMC § 6.10.050, .080.

**29.** *See* AS 14.14.060(c) (providing that assembly "shall determine the total amount to be made available from local sources...."); Charter art. VI, § 6.05(b) (providing assembly "may increase or decrease the budget...."); AMC § 6.10.050. As part of this process, the assembly must also

only as to the total amount; it may not modify individual items within the budget.[30] The assembly must approve the budget as amended and must determine the total amount of local source money[31] and appropriate the necessary funds.[32] If the assembly does not act in a timely manner, the amounts the school board proposes become the school district's budget and local source appropriation.[33]

The municipality by ordinance has added a School Budget Advisory Commission to this process.[34] Composed of members appointed by the mayor and confirmed by the assembly, the commission advises the assembly on the details of the school budget and recommends what action should be taken on the budget.[35]

C. *Does Subsection 5.02(c) of the Charter Give the Mayor Power to Veto and Reduce the Assembly's School District Budget and Local Source Appropriation Ordinances?*

■ In interpreting a constitutional document such as the Anchorage charter,[36] we first look to its language.[37] We therefore begin with the text of charter subsection 5.02(c), which provides in pertinent part: "The mayor has the veto power. The mayor also has line item veto power. The mayor

may, by veto, strike or reduce items in a budget or appropriation measure."[38]

We first consider whether the charter gives the mayor power to veto the assembly's school budget ordinance in its entirety. We next consider whether the charter grants the mayor item veto power over the school budget ordinance such that the mayor may reduce its total amount.

1. *The general veto power*

■ The municipality argues that the first sentence of subsection 5.02(c) gives the mayor power to veto all assembly ordinances, including school budget ordinances, unless a specific prohibition provides otherwise. Repasky, Long, and the school district argue that because the charter does not expressly allow for a mayoral veto over the school budget, no such power exists.

The municipality's reading is more persuasive. First, the language of charter subsection 5.02(c) is sweeping. It expresses no limit on the general veto power. And charter subsection 16.03(a) supports the idea that subsection 5.02(c) grants a general veto power unless specifically enumerated exceptions apply. Section 16.03 established the former Anchorage Telephone Utility (ATU) and stated that the mayor's veto power did not extend to assembly actions concerning the appointment of ATU directors.[39] No compa-

---

determine the portion of the municipality's school budget to be funded from local sources and appropriate the local moneys to fund the school budget. AS 14.14.060(c); AMC § 6.10.050, .080(B).

**30.** AS 14.14.060(c); Charter art. VI, § 6.05(b). Subsection 6.05(b) of the charter provides:

The assembly may increase or decrease the budget of the school district only as to total amount. The school district may not appropriate or otherwise incur the expenditure of any funds, regardless of the source, in excess of the total amount of the budget, as approved by the assembly, without prior approval by the assembly.

**31.** AS 14.14.060(c).

**32.** *Id.;* Charter art. VI, § 6.05(c).

**33.** Charter art. VI, § 6.05(c).

**34.** AMC § 04.50.070.

**35.** *Id.* The commission recommended eliminating $12.5 million from the total amount of the proposed school budget for 1995–96. The commission recommended reducing the school board's proposed 1997–98 budget by $3 million.

**36.** *Area G Home & Landowners,* 927 P.2d at 731.

**37.** *Lagos v. City of Sitka,* 823 P.2d 641, 643 (Alaska 1991).

**38.** AMC § 2.30.100 provides similarly.

**39.** Charter art. XVI, § 16.03(a). That subsection provides in relevant part:

The Anchorage Telephone Utility shall be governed by a board of directors consisting of five members.... *Exercise of the power of the veto by the mayor shall not extend to actions of the assembly with respect to appointment of directors.*

(Emphasis added.) This limitation on the mayoral veto also appears in AMC § 2.30.100, which provides:

rable provision of the charter prohibits the mayor from vetoing assembly actions regarding the school budget. We therefore conclude that the charter grants the mayor a general veto power over the entire school district budget ordinance.

### 2. *The item veto power*

In 1990 the following language was added to charter subsection 5.02(c): "The mayor also has line item veto power. The mayor may, by veto, strike or reduce items in a budget or appropriation measure." [40] The municipality points out that this amendment came about because the municipality's 1990 Charter Review Commission believed it necessary to clarify whether the mayor had line item veto power. The municipality argues that even before the 1990 amendment, the mayor could reduce the total amount of the municipality's school budget appropriation and that the amendment simply "clarified" that "budgets" were also measures the mayor could reduce by veto. Long and the school district respond that this added language does not extend the line item veto to school budgets. They argue that the terms "budget" and "appropriation" as defined in the charter do not encompass the school budget.

### a. *The terms "budget" and "appropriation" in charter subsection 5.02(c) encompass the school budget.*

The charter defines "appropriation" as "a unit of funding ... in the municipal budget." [41] Long and the school district argue that the school budget is not a "unit of funding ... in the municipal budget." They think it significant that separate sections of the charter discuss the municipal and school budgets. [42] The school district argues that this separation is highlighted by the mayor's ability to transfer unencumbered funds between departments within all appropriations except the school budget appropriation. [43] Long and the school district therefore argue that the item veto extends only to the municipal budget and not to the separate school budget. The school district also asserts that the term "budget" in the charter does not encompass the school system budget, because the Charter Review Commission did not mention the school budget when it discussed the item veto and because we have held that the "assembly has no legislative power to make appropriations for specific items, programs or priorities provided for by the school board's budget." [44]

The municipality replies that the Anchorage School District is part of the municipali-

---

A. The mayor has the veto power as provided in Charter section 5.02(c).

B. The mayor may not veto actions of the assembly concerning the adoption or abandonment of a manager plan of government as provided in the laws of the state or actions of the board of equalization or the board of adjustment.

C. The mayor may not veto actions of the assembly with respect to appointment of directors of the Anchorage Telephone Utility, enactment of legislation by the Assembly under Charter section 16.03(h), approval of the annual budget of the Anchorage Telephone Utility, and actions of the Assembly with respect to Anchorage Telephone Utility matters reserved to the assembly under the Charter.

**40.** Subsection 5.02(c) provides in full (1990 addition emphasized):

The mayor has the veto power. *The mayor also has line item veto power. The mayor may, by veto strike or reduce items in a budget or appropriation measure.* The veto must be exercised and submitted to the assembly with a written explanation within seven days of passage of the ordinance affected. The assembly, by two-thirds majority vote of the total mem-

bership, may override a veto any time within 21 days after its exercise.

**41.** Charter art. XVII, § 17.13(a). This subsection provides in full:

"Appropriation" means a unit of funding provided for by the assembly in the municipal budget. An appropriation may be specific as to particular expenditures or general as to an entire department or agency as the assembly deems appropriate.

**42.** Charter art. VI, § 6.05 (school budget); art. XIII, § 13.05 (addressing municipal budget and appropriations process).

**43.** Charter art. XIII, § 13.06(b) (providing that "[e]xcept as to the school budget, the mayor may transfer all or part of any unencumbered balance between categories within an appropriation"). Subsection 13.06(b) also permits the school board to transfer unencumbered funds between categories within the school budget appropriation.

**44.** *Tunley*, 631 P.2d at 75–76.

ty, and that therefore the assembly's annual school budget ordinance—which approves the total amount of the district's annual budget, determines the amount of funding from local sources, and appropriates the local source funds for the district's budget—is by its terms a municipal "budget or appropriation measure." [45] The municipality also notes that the subsection 5.02(c) veto power does not distinguish between the budgets for general government, the school district, and the utilities, each of which has a separately identifiable municipal budget.[46] Finally, the municipality offers two reasons why the school budget process is described in a separate section of the municipal charter: first, because the school system operates on a separate fiscal year, and second, because the procedures for approving the school budget differ from the procedures for approving other budget items, not because the school budget was intended to be segregated from the municipal budget.

We find the municipality's interpretation more persuasive. First, the school budget ordinance qualifies as a "budget measure" under subsection 5.02(c). A school budget ordinance is in appearance and substance a "budget measure." Appellees provide no persuasive reason why it should not be treated as such.

Second, it is significant that the school district is governmentally part of the municipality,[47] that the school district budget is for amounts that must be expended in order to operate public schools in the municipality, and that the school district budget includes amounts the municipality must contribute from local sources to operate the school sys-

tem. We therefore agree with the municipality that the term "municipal budget" as used in the charter's definition of "appropriation" [48] inherently includes the school district budget.

Further, as the municipality points out, the charter uses the term "appropriation" in sections which deal exclusively with the school budget.[49] This usage indicates that the charter framers considered the school district budget ordinance to be an "appropriation." Subsection 6.05(c) directs the assembly to "appropriate" funds for the school district.[50] The ordinance appropriating these funds is both an "appropriation" and an "appropriation measure" for purposes of the charter.[51] Placing the topic of the school budget in a charter section apart from sections concerning other municipal budgets does not mean that the school budget is not part of the total municipal budget.

Finally, given its absolute and relative size, it is counterintuitive to think that the school district's local source appropriation is not part of the municipal budget. The 1997–98 local source school appropriation required the municipality to contribute $100,228,823; this was about twenty-nine percent of the district's total operating budget of $358,723,000.[52] The local source school appropriation is also a very large part of the total municipal budget.[53]

   b. *The mayor has item veto power over the total amount of the school budget.*

■ We have thus concluded that the language of subsection 5.02(c) granting the may-

---

**45.** Charter art. V, § 5.02(c).

**46.** Charter art. XIII, § 13.03 (general government); art. VI, § 6.05 (schools); art. XVI, §§ 16.01(b) (utilities); 16.03(f) (former Anchorage Telephone Utility).

**47.** The Anchorage School District is coextensive with the Municipality of Anchorage. AS 14.12.010; AS 29.35.160(a).

**48.** Charter art. XVII, § 17.13(a).

**49.** Charter art. VI, § 6.05(c); art. XIII, § 13.06(b).

**50.** Charter art. VI, § 6.05(c) ("The Assembly shall approve the budget of the school district and *appropriate* the necessary funds ....") (emphasis added).

**51.** Charter art. V, § 5.02(c); art. XVII, § 17.13(a).

**52.** *Cf. Macauley*, 491 P.2d at 122 n. 6 (noting that by statute (since repealed), the state supplied "a minimum of 90% of school operating funds.").

**53.** AMC § 21.05.075A ("Nearly 70% of the local tax dollar now goes to elementary and secondary educational programs.").

or line item veto power encompasses the school budget ordinances. But as Long recognizes, giving the mayor line item veto power over a school district budget ordinance is potentially problematic because the assembly's school budget ordinance only addresses the total amount of the budget. The ordinance does not list the individual proposed expenditures that make up the total proposed school district budget or local source appropriation. The mayor's veto messages characterized his 1995 and 1997 vetoes as "line item" vetoes. Perhaps the mayor felt he was exercising a "line item" veto because he was not vetoing the entire school budget ordinance, but was only reducing its total amount.[54] In this sense, the mayor exercised an item veto over a single-item appropriation.

Is a single-item appropriation an "item" for purposes of the item veto? The item veto historically originated as a reform measure conceived in part to prevent legislators from "logrolling" when enacting appropriations bills which necessarily address many subjects and need not be confined to a single subject.[55] The item veto therefore typically addresses appropriations containing numerous items.[56] But another historical purpose was to give the executive branch some ability to reduce a legislature's excessive appropriations[57]—a purpose still recognized as valid.[58] Thus, the fact that the assembly's school

district budget ordinance only specifies the total amount, and lists no component items, does not mean that the total amount is not an "item." The ordinance appropriates "a sum of money dedicated to a particular purpose."[59]

We therefore hold that the charter grants the mayor the power to veto the entire school district budget ordinance, or to exercise an item veto and reduce the total amount of the budget ordinance and the total amount of the local source appropriation.

### D. Is the Veto Power Substantially Irreconcilable with State Law?

■ Having held that the municipality's veto power extends to the total amounts of school district budget and local appropriation ordinances, we must decide whether, as Long, Repasky, and the school district argue, state law impliedly prohibits that power.[60]

■ The Municipality of Anchorage is a home rule municipality and therefore has "all legislative powers not prohibited by law or by charter."[61] By contrast, a general law municipality "is an unchartered borough or city [with] legislative powers conferred by law."[62] In deciding whether the state has limited the powers of home rule municipalities, we first look for prohibitions, not grants of power.

---

54. The parties do not discuss whether the mayor has to sign the assembly's school budget ordinance for it to become law. Charter article X, subsection 10.01(c) dictates that an ordinance takes effect "upon adoption" by the assembly. Thus, no mayoral signature is needed.

55. *Bengzon v. Secretary of Justice of the Philippine Islands*, 299 U.S. 410, 415, 57 S.Ct. 252, 81 L.Ed. 312 (1937); *Alaska Legislative Council v. Knowles*, 21 P.3d 367, 373 & n. 33 (Alaska 2001); *Cenarrusa v. Andrus*, 99 Idaho 404, 582 P.2d 1082, 1091 (1978).

56. *See generally* Richard Briffault, *The Item Veto in State Courts*, 66 Temp. L.Rev. 1171 (1993).

57. *Alaska Legislative Council*, 21 P.3d at 367.

58. *See* Briffault, *supra* note 56, at 1179–80.

59. *Alaska Legislative Council*, 21 P.3d at 371. Although the school district's financial plan specifies proposed expenditures by category and by fund, the assembly in considering the school

district's budget and appropriation ordinance must effectively treat the ordinance as proposing a single figure for a particular purpose. Charter art. VI, § 6.05(b) (assembly may increase or reduce school budget "only as to total amount"). *See also* AS 14.14.060(c) (requiring board to submit budget to assembly "for approval of the total amount").

60. The superior court did not decide this issue, having held that the veto power was not intended to extend to the school board budget. Having reached the opposite conclusion about the power conferred, we must consider the second issue, because it could be an alternative ground for affirming the superior court's judgment. We apply our independent judgment to this issue because it raises only questions of law. *See supra* Part III.A.

61. Alaska Const. art. X, § 11; AS 29.04.010; *see also* Charter art. III, § 3.01.

62. AS 29.04.020.

■ Long, Repasky, and the school district do not claim that state law expressly prohibits the Anchorage mayor from having this veto power. Alaska Statute 29.20.270(c) expressly prohibits a mayoral veto of "appropriation items in a school budget ordinance."[63] But this prohibition does not apply to home rule municipalities,[64] and therefore does not apply to the Municipality of Anchorage.[65] Alaska law does not expressly prohibit the municipality from conferring this power on its mayor.

■■ State law can also prohibit a municipality from exercising authority "by implication such as where the statute and ordinance are so substantially irreconcilable that one cannot be given its substantive effect if the other is to be accorded the weight of law."[66] In general, for state law to preempt local authority, it is not enough for state law to occupy the field.[67] Rather, "[i]f the legislature wishes to 'preempt' an entire field, [it] must so state."[68]

■ But in the context of public education—a field subject to "pervasive" state control[69]—we have precluded even home rule municipalities from acting unless they were exercising power delegated by the legislature.[70] A home rule municipality cannot enact an ordinance which conflicts with a state education statute.[71]

The relevant constitutional provisions are not determinative. One requires the legislature to "establish and maintain a system of public schools."[72] Another expresses an intention "to provide for maximum local self-government," and provides that "[a] liberal construction shall be given to the powers of local government units."[73] Another provides that home rule municipalities "may exercise all legislative powers not prohibited by law or charter."[74]

Two statutes are of particular interest here. Alaska Statute 14.14.060(c) is important because Long, Repasky, and the school district argue that it impliedly prohibits the disputed veto power. Alaska Statute 29.20.270(c)(1) is important because the legislature made its express prohibition on vetoing appropriation items in school budget ordinances inapplicable to home rule municipalities.

### 1. *Effect of AS 14.14.060(c)'s silence about a mayoral role or veto*

■ Alaska Statute 14.14.060(c) gives assemblies power to determine and appropriate the total amount of local moneys for their districts' annual budgets. Repasky, Long, and the school district invoke this statute in making three main arguments to show that the state's pervasive authority over education precludes item vetoes of school district budget ordinances.

---

**63.** AS 29.20.270 deals with the mayoral veto power. AS 29.20.270(c) provides in pertinent part: "The veto does not extend to (1) appropriation items in a school budget ordinance...."

**64.** AS 29.10.200 ("Only the following provisions of this title apply to home rule municipalities as prohibitions on acting otherwise than as provided."); *see also Faipeas v. Municipality of Anchorage*, 860 P.2d 1214, 1222 n. 3 (Alaska 1993) (noting that legislature enacted AS 29.10.200 to make explicit which provisions of Title 29 applied to home rule municipalities and which did not).

**65.** AS 29.10.200; Charter art. III, § 3.01.

**66.** *Jefferson v. State*, 527 P.2d 37, 43 (Alaska 1974).

**67.** *Id.* at 43 & n. 33.

**68.** *Id.*

**69.** *Macauley v. Hildebrand*, 491 P.2d 120, 122 (Alaska 1971).

**70.** *Jefferson*, 527 P.2d at 43 n. 33 (characterizing *Macauley v. Hildebrand*, 491 P.2d 120, as follows: "Thus, home rule municipalities were precluded from exercising power over education unless, and to the extent, delegated by the state legislature; and the local ordinance was therefore overridden by the statute").

**71.** *Macauley*, 491 P.2d at 122 (blocking enforcement of Juneau ordinance which conflicted with state education statute because ordinance conflicted with state law on matter of statewide concern).

**72.** Alaska Const. art. VII, § 1.

**73.** Alaska Const. art. X, § 1.

**74.** Alaska Const. art. X, § 11.

First, they find it significant that AS 14.14.060(c) grants the assembly power in the school budget appropriation process, but says nothing of a mayoral role in that process. The school district finds the omission especially significant because two other subsections of AS 14.14.060 specifically grant authority to the municipal executive branch in education contexts other than the budget-approval process.[75] It consequently reasons that the Alaska legislature did not intend to give municipal mayors any role in the appropriation process described in AS 14.14.060(c). Long similarly argues that a mayoral veto would usurp the school board's authority and upset the legislatively created relationship between the school board and the assembly. She asserts that the state gave primary educational authority to the school board, a limited fiscal review power to the assembly, and no power to the mayor. Repasky asserts that a mayoral veto would interfere with the assembly's statutory role, a role which he characterizes as akin to a veto power over the school board's legislative actions.

We are not persuaded that the absence of any reference in AS 14.14.060(c) to a mayoral role or veto is controlling. The statute gives municipal assemblies power to enact ordinances approving or reducing school district budgets. It does not try to describe comprehensively what happens after an assembly enacts an appropriation ordinance.

Further, the statute addresses the legislative appropriation power. It does not give the assembly a veto-like power which might conceptually conflict with a mayoral veto or make a mayoral veto redundant. The Alaska legislature also would have recognized that municipal budget ordinances are legislative enactments which are typically subject to the veto or item veto power. Nonetheless, it did

not prohibit exercise of the veto power in the school budget ordinance context in AS 14.14.060(c) or elsewhere in Title 14. It withheld that power in Title 29, but only as to non-home rule municipalities.[76]

We think it is important that the legislature, which would have known that the prohibition in AS 29.20.270(c)(1) did not apply to home rule municipalities, did not address the veto issue in AS 14.14.060(c). If the legislature had intended to prohibit mayors of all classes of municipalities from vetoing school budget ordinances, it easily could have carried out that intention in AS 14.14.060(c). The existence of AS 29.20.270(c)(1) implies that the legislature did not consider AS 14.14.060(c) to preclude that veto power. And by making the express prohibition set out in AS 29.20.270(c)(1) inapplicable to home rule municipalities,[77] the legislature impliedly chose to let each home rule municipality decide whether to give its mayor the power to veto or reduce school district budget ordinances.

The dissent contends that it was not necessary to make AS 29.20.270(c)(1)'s veto prohibition expressly applicable to home rule municipalities.[78] It reasons that AS 14.14.060 and .065 make it clear that no municipality (including a home rule municipality) could give its mayor veto power over assembly action on a school district budget.[79] But if this were so, the express prohibition in AS 29.20.270(c)(1) would be unnecessary for any municipality, home rule or not, because AS 14.14.060 and .065 would be all the prohibition needed. The specific prohibition in AS 29.20.270(c)(1) instead indicates that the legislature did not read AS 14.14.060 and .065 to prohibit such vetoes expressly or impliedly,[80] as to any class of municipality.[81]

---

75. AS 14.14.060(a), (f).

76. AS 29.10.200; AS 29.20.270(c).

77. AS 29.10.200.

78. Dissent at 319.

79. *Id.*

80. We assume that the legislature would not enact a statute which would be superfluous and we

interpret statutory language to avoid superfluity. *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) ("We must also presume 'that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.'" (quoting *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 530–31 (Alaska 1993))).

81. AS 29.10.200.

The issue here is really whether the veto power interferes with the role of the assembly, not the school board. The school board's power is at least partly legislative.[82] But the assembly's power to approve the total amount of the budget and appropriate the local source money is also typically legislative. That the Anchorage electorate, in adopting the charter and later amending it, chose to reallocate some of the assembly's legislative power by giving the mayor a veto power does not change the relationship between the assembly and the school board. And as between the school board and the municipality, the legislature chose to delegate the final budget approval power to the municipality. In effect, the municipality has allowed its mayor to share some of the assembly's influence over the amount appropriated. Doing so, in our view, does not detract from the school board's role in proposing a budget,[83] deciding how to spend amounts appropriated and setting educational policy,[84] or administering expenditures after appropriation.[85]

■ We therefore conclude, as the municipality argues, that the authority granted to the assembly by AS 14.14.060(c) is subject to any veto power the mayor has over assembly actions. Citing the constitution, the municipality asserts that as a home rule municipality it "may exercise all legislative powers not prohibited by law or by charter."[86] It contends that although the state has pervasive authority over education, it has not prohibited the municipality from exercising its

legislative powers, including the mayoral veto power, in the field of education. We agree.

Further, Repasky's first argument seems to rest in part on his assertion that the mayor was not unambiguously given this veto power. The same assumption may underlie the school district's contention that our decisions in *Peninsula Marketing Ass'n v. Rosier*[87] and *Ross v. City of Sand Point*[88] foreclose the municipality's argument. In *Rosier* we determined that the Commissioner of Fish and Game could not use the commissioner's emergency powers to veto decisions of the Board of Fisheries.[89] In *Ross* we held that a mayor could not override an employment decision of the city's grievance committee.[90] These cases are distinguishable from the present dispute because the executives there relied only on implied veto powers.[91] The executive in *Rosier* had no veto authority originating from another source.[92] And the mayor in *Ross* could not veto the grievance board's decisions because the city had not granted the mayor any veto power[93] when it created its personnel system as required by state statute.[94] The mayor's statutory authority to appoint, suspend, or remove employees[95] was not equivalent to a veto power.[96] In comparison, we concluded above in Part III.C that subsection 5.02(c) of the Anchorage charter granted the mayor power to veto the assembly's ordinances.

Long, Repasky, and the school district cite two of our decisions, *Tunley v. Municipality of Anchorage Sch. Dist.*[97] and *Macauley v. Hildebrand,*[98] to support their contention

---

82. *E.g., Copper River Sch. Dist. v. Traw,* 9 P.3d 280, 286 (Alaska 2000).

83. *See* AS 14.14.060(c).

84. *See Tunley,* 631 P.2d at 77.

85. *See Macauley,* 491 P.2d at 121.

86. Alaska Const. art. X, § 11; *see also* AS 29.04.010.

87. 890 P.2d 567 (Alaska 1995).

88. 952 P.2d 274 (Alaska 1998).

89. *Rosier,* 890 P.2d at 573.

90. *Ross,* 952 P.2d at 277.

91. *Rosier,* 890 P.2d at 573; *Ross,* 952 P.2d at 277.

92. *Rosier,* 890 P.2d at 573 (holding that implying a veto power "would eviscerate powers explicitly granted" to the board by statute).

93. *Ross,* 952 P.2d at 277.

94. *See* AS 29.20.410(a).

95. AS 29.20.250(a).

96. *Ross,* 952 P.2d at 277.

97. 631 P.2d 67 (Alaska 1980).

98. 491 P.2d 120 (Alaska 1971).

that state law, particularly that found in AS 14.14.060(c), is substantially irreconcilable with this mayoral veto power.

We held in those two cases that home rule municipalities had not been granted authority to act in educational policy matters delegated to the local school boards.[99]  In one, a municipality attempted to impose accounting controls over expenditure of funds already appropriated for operating the district's schools.[100]  In the other, an assembly attempted to determine which schools would be closed.[101]  Both cases concerned operational and policy choices broadly delegated to school boards.  And in both cases the municipalities' attempts to exercise authority did not arise from the limited authority the Alaska legislature had delegated to the municipalities.

That is not the situation here.  The legislature expressly gave municipalities the power to approve or reduce the total amounts of the proposed budget and local appropriation.  The mayoral veto is not substantially irreconcilable with that power.

### 2.  Effect of AS 14.14.060(c)'s time requirements

■ Second, Long, Repasky, and the school district argue that the process AS 14.14.060(c) describes and the schedule it contemplates would be incompatible with the delays mayoral vetoes would cause.  They note that the statute provides that if the assembly does nothing for thirty days after receiving the budget, the budget proposal becomes the budget and local source appropriation.[102]  The municipality responds that this simply means that local powers over the school budget are cut off after thirty days, and that AS 14.14.060 "does not mean nor imply that during the allotted 30 day period the Municipality cannot exercise its home rule powers."  We find the municipality's argument more persuasive.  Alaska Statute

14.14.060(c) only addresses the appropriation process and does not undertake to describe all events that may follow the assembly's enactment of a school budget ordinance.

### 3.  Consequences of allowing veto

Third, reasoning that because courts do not read ambiguous legislation to reach absurd results,[103] Repasky argues that allowing this veto would lead to "convoluted political consequences."  He anticipates that an assembly might take no action on a school budget ordinance, leading to automatic approval, in order to deny the mayor a veto opportunity; he also anticipates that a mayor might veto the ordinance just before the thirty-day window expires, in order to prevent an override vote.  Further, he claims that permitting a mayoral veto would require the school budget to clear hurdles never intended by the legislature.

■ But we do not read AS 14.14.060(c) as intending to insulate school district budgets from local political influences.  The statute makes it clear that the local appropriations for a school district are subject to municipal approval.  Arguments that an item veto would be undesirable in the context of appropriations for the critical function of public education—because the veto is exercised without a public hearing, is exercised by only one person, and might not be successfully overridden—would apply with equal force to most public appropriations.  Those arguments generally implicate the item veto power;  they do not assist in interpreting AS 14.14.060(c).

Repasky and Long's arguments demonstrate that the mayor's veto adds an extra political element to the school budget process, but they do not establish that the veto power irreconcilably conflicts with Title 14.  Other parts of the municipal budget are enacted by the assembly and are subject to a mayoral veto.[104]  Allowing the mayor to veto

**99.**  *Tunley,* 631 P.2d at 76–77;  *Macauley,* 491 P.2d at 122.

**100.**  *Macauley,* 491 P.2d at 121.

**101.**  *Tunley,* 631 P.2d at 75–76.

**102.**  AS 14.14.060(c).

**103.**  *Sherman v. Holiday Constr. Co.,* 435 P.2d 16, 19 (Alaska 1967) (refusing to interpret statute to produce "glaringly absurd" results).

**104.**  As noted above, however, the budget for the former Anchorage Telephone Utility was not subject to a mayoral veto.  Charter art. XVI, § 16.03; AMC § 2.30.100(c).

the school budget ordinance puts the appropriation process on footing equivalent, but not identical, to that of other municipal budgets. The municipality's school budget is a large part of the municipality's expenditures and property taxes. The municipality argues that the school budget is growing faster than any other municipal expenditure and caused a fifty-one percent increase in property taxes between 1990 and 1998.[105] Such assertions explain the municipality's interest in exercising the appropriation power granted by AS 14.14.060(c). They also illustrate why home rule municipalities might choose to adopt an item veto power that encompasses school district appropriation ordinances. And they are consistent with the absence of an express or implied prohibition preventing a home rule municipality from sharing its legislative power with its mayor as a means of directly influencing the school budget and the resulting burden on local taxpayers.

#### 4. *Implied prohibition summary*

State law does not expressly prohibit home rule municipalities from adopting this veto power. Education is subject to pervasive state control in Alaska. But AS 14.14.060(c) gives municipalities, not their school boards, the final word over the total amount of their school districts' proposed budgets. Only the school boards can decide how to spend the available funds, but the municipalities may limit the funds available. An item veto that only affects the total amount the assembly appropriates respects this limitation on the powers of the school boards. Alaska Statute 14.14.060(c) does not prohibit the municipality from delegating to the mayor, in the form of the veto power, part of the assembly's role in the process of approving the budget ordinance. Alaska Statute 14.14.060(c) does not address what happens after the assembly enacts an appropriation ordinance. It does not specify or imply a procedure that is inconsistent with a mayoral veto. And finding in AS 14.14.060(c) some implicit prohibition on this veto power would be inconsistent with AS 29.20.270(c)(1) and AS 29.10.200. Where possible, we construe sections of a statutory scheme to be consistent with one another.[106] We therefore hold that allowing a mayoral veto over the school budget does not irreconcilably impede the purposes of Title 14.

Contrary to the dissent's argument,[107] we are not favoring the constitution's home rule clause over its public education clause. We read Titles 14 and 29 of the Alaska Statutes to allow home rule municipalities to permit their executives to apply the item veto power to school budget ordinances. We thus adhere to a policy choice the Alaska legislature has already made.

We consequently conclude that AS 14.14.060 and charter subsection 5.02(c) are not "so substantially irreconcilable that one cannot be given its substantive effect if the other is to be accorded the weight of law." [108]

#### IV. *CONCLUSION*

We conclude that Anchorage Municipal Charter subsection 5.02(c) grants the mayor the item veto power over the assembly's school district budget and local source school budget appropriation ordinances. We also conclude that AS 14.14.060(c)'s grant of authority to the assembly does not preclude a home rule municipality from giving its mayor this veto power. We finally conclude that this veto power is not substantially irreconcilable with state law. Accordingly, we REVERSE the judgment below and REMAND for entry of judgment for the municipality.

FABE, Justice, not participating.

---

**105.** The School Budget Advisory Commission proposed reducing the school district's 1997–98 budget proposal by $3,000,000. The assembly and mayor's reductions totaled $3,000,000. The Advisory Commission noted that, even as so reduced, the budget was about nine percent larger than the budget for the prior year.

**106.** *Rosier,* 890 P.2d at 573 (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.06 (5th ed. 1992) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void, or insignificant.")).

**107.** Dissent at 320.

**108.** *Jefferson,* 527 P.2d at 43.

BRYNER, Justice, dissenting.

I disagree with the court's decision to uphold the mayor's power to reduce the school district budget by veto. In my view, the court's opinion misinterprets Alaska law and disregards settled standards for resolving conflicts between state and municipal law. I would hold that our law narrowly delegates the power of school-budget approval to the assembly alone, expressly insulating its actions from reduction by veto.

## I. STATE LAW PRECLUDES A MAYORAL VETO.

### A. Constitutional and Statutory Framework

Public education in Alaska is a function of state government. Article VII, section 1 of the Alaska Constitution provides that "[t]he legislature shall by general law establish and maintain a system of public schools open to all children of the State." [1] We have consistently interpreted this provision as "a clear 'mandate for pervasive state authority in the field of education.'" [2] The legislature has assigned primary responsibility for exercising this authority to local school boards.[3] Because municipal revenues make up a large portion of a school district's budget, the legislature has also decided "to give municipal assemblies certain powers with regard to school board budgetary and accounting processes." [4] But the legislature has delegated none of the school board's budgeting power to mayors.

Although Anchorage is a home rule city, AS 14.14.065 requires it to be treated as a borough in its dealings with the Anchorage School District's school board:

The relationships between the school board of a city school district and the city council and executive or administrator are governed in the same manner as provided in AS 14.14.060 for the school board of a

borough school district and the borough assembly and executive or administrator.

Alaska Statute 14.14.060, the statute mentioned in the above-quoted provision, delineates a borough school district's relationship to its corresponding borough government. Subsection .060(c) expressly covers school district budgets and the appropriation of borough school funds, conferring certain narrow powers on the assembly and vesting it with specific responsibilities:

(c) Except as otherwise provided by municipal ordinance, the borough school board shall submit the school budget for the following school year to the borough assembly by May 1 for approval of the total amount. Within 30 days after receipt of the budget the assembly shall determine the total amount of money to be made available from local sources for school purposes and shall furnish the school board with a statement of the sum to be made available. If the assembly does not, within 30 days, furnish the school board with a statement of the sum to be made available, the amount requested in the budget is automatically approved. Except as otherwise provided by municipal ordinance, by June 30, the assembly shall appropriate the amount to be made available from local sources from money available for the purpose.

### B. Alaska Statute 14.14.060(c) Gives Certain School–Budget Powers to the Assembly, but Not to the Mayor.

The plain language of AS 14.14.060(c) delegates budgetary powers and duties directly to the assembly—not to the borough as a whole; not to its mayor; not to a combination of the assembly and the mayor. The statute's narrow scope of delegation becomes even clearer when we consider subsection .060(c) in light of AS 14.14.060's other subsections; their delegating language expressly

---

**1.** *See also* AS 14.03.010 (establishing "in the state a system of public schools to be administered and maintained as provided in this title").

**2.** *Tunley v. Municipality of Anchorage Sch. Dist.,* 631 P.2d 67, 77 (Alaska 1980) (quoting *Macauley v. Hildebrand,* 491 P.2d 120, 122 (Alaska 1971));

*see also Jefferson v. State,* 527 P.2d 37, 44 (Alaska 1974).

**3.** *See Tunley,* 631 P.2d at 76.

**4.** *Id.*

differentiates between a borough's assembly and its administrator.

For instance, subsection .060(a) states that "[t]he borough assembly may by ordinance require that all school money be deposited in a centralized treasury"; but the subsection then specifies that "*[t]he borough administrator* shall have the custody of, invest, and manage all money in the centralized treasury." [5] Similarly, subsection .060(f) makes the school board responsible for custodial services and routine maintenance, but directs that all major rehabilitation and repair be provided by "[t]he borough assembly *through the borough administrator.*" [6] These provisions demonstrate beyond cavil that, in delegating specified school district powers to local government through AS 14.14.060, the legislature knew how to distinguish between the assembly and the mayor and that it fully appreciated the need to do so explicitly when it wanted to draw that distinction.

Common sense and plain meaning, then, point strongly to the conclusion that, in assigning the power to approve a borough school district's budget to "the assembly," the legislature meant just that.

The court shrugs off this evidence of legislative intent, theorizing that subsection .060(c)'s narrow delegation to the assembly implicitly carries with it the mayor's legislative power: "[A]s between the school board and the municipality, the legislature chose to delegate the final budget approval power to the municipality. In effect, the municipality has allowed its mayor to share some of the assembly's influence over the amount appropriated." [7]

But the court's theory strains plain meaning, especially when subsection .060(a) is viewed—as it must be viewed—in conjunction with AS 14.14.065. The latter provision

requires that in a city like Anchorage "[t]he relationships between the school board of [the] city school district and the city council and executive or administrator" must be "governed in the same manner as provided [for boroughs] in AS 14.14.060." By recognizing that AS 14.14.060 governs "relationships"—in other words, that it describes the powers of a city's "school board," its "city council," and its "executive or administrator" *in relation* to each other—AS 14.14.065 forecloses the possibility that AS 14.14.060(c)'s delegation of power to "the assembly" was intended to encompass powers belonging to the mayor; for in a provision defining the powers of the "assembly" in relation to the "administrator," each term necessarily excludes the other.[8]

The court's theory also violates AS 14.14.060's core purpose. The court correctly notes that municipalities contribute large sums of local source funds to the school district budget and therefore have a legitimate stake in the school-budget process.[9] But the municipality's stake in local source funding hardly justifies reading AS 14.14.060(c) as a provision that abdicates state control over the school board budget and allows the municipality to treat the board as a de facto municipal agency. State law creates the school board as an independent governmental body;[10] and under the Alaska Constitution's public education clause,[11] the state has an overriding interest in preserving the board's independence, so that its actions will be faithful to "[t]his constitutional mandate for pervasive state authority in the field of education."[12] Moreover, state revenues comprise the lion's share of a school district budget; even in Anchorage, where local source contributions outpace those of smaller municipalities, state appro-

5.  Emphasis added.

6.  Emphasis added.

7.  Majority Opinion at 313.

8.  In other words, to adopt the court's interpretation would require the nonsensical conclusion that, in describing the powers of the "assembly" in relation to the powers of the "administrator," section .060 means "administrator" when it says

"administrator," but means "assembly and/or administrator" when it says "assembly."

9.  *See, e.g.,* Majority Opinion at 309, 310.

10.  *See, e.g., Tunley v. Municipality of Anchorage Sch. Dist.,* 631 P.2d 67, 76 (Alaska 1980).

11.  Alaska Const. art. VII, § 1.

12.  *Id.*

priations pay more than seventy percent of the annual school district budget.[13]

Thus, while the city undeniably has a legitimate stake in the school district's budgetary process, the state's interest is both constitutionally and economically superior. And because a school board's ability to capture adequate state funding depends on an early and reliable determination of local source funding, the board has a critical need to ensure that the municipal contribution is promptly determined, without being derailed by local politics. Alaska Statute 14.14.060(c) reflects these concerns: it strives to afford municipalities an opportunity to determine the amount of their local source contributions, but at the same time it protects the state's vital and overriding interest in early certainty.

Despite the court's assertion to the contrary, nowhere does AS 14.14.060(c) "expressly" give municipalities "the power to approve or reduce the total amounts of the proposed budget and local appropriation";[14] rather, it "expressly" delegates power only to "the assembly." And in spite of the court's view that AS 14.14.060(c) "does not try to describe comprehensively what happens" when a school board submits its budget to the assembly for approval,[15] the statute does just that.

The first sentence of subsection .060(c) specifies that the board must submit its budget for the following school year to the assembly by May 1.[16] While the first sentence suggests that the budget is submitted "for approval of the total amount," the next sentence of subsection .060(c) makes it clear that the assembly's approval power is limited to determining the amount of the local source contribution; and to exercise this power, the assembly must make its determination and notify the board within thirty days.[17] The subsection's third sentence then specifies what happens if the assembly fails to act as prescribed: the school board's proposed local source contribution is automatically deemed approved.[18] Finally, the fourth sentence of subsection .060(c) provides that once the approved amount of local source funding is fixed, the assembly must appropriate that amount no later than June 30.[19]

Thus, AS 14.14.060(c) does "describe comprehensively what happens": it defines a two-step process for assembly action on the school board budget; the first step is optional, the second mandatory. First, if it acts promptly to make the determination and inform the board, the assembly may approve the amount of the local source contribution; failing that, the amount stated in the school board budget is automatically approved. Second, once the approval occurs—by action or inaction—the assembly *must* appropriate the approved amount by June 1; the statute allows no other amount, so the issue of a mayoral veto becomes moot.

Neither the tight and comprehensive structure of this statute nor its underlying purpose leaves room for the "extra political wrinkle" of a mayoral veto. Assuming, then, that the court is correct in construing the Anchorage charter to "reallocate some of the assembly's legislative power,"[20] this realloca-

---

13. *See* Majority Opinion at 304–305.

14. Majority Opinion at 314.

15. Majority Opinion at 312.

16. "Except as otherwise provided by municipal ordinance, the borough school board shall submit the school budget for the following school year to the borough assembly by May 1 for approval of the total amount."

17. "Within 30 days after receipt of the budget the assembly shall determine the total amount of money to be made available from local sources for school purposes and shall furnish the school board with a statement of the sum to be made available."

18. "If the assembly does not, within 30 days, furnish the school board with a statement of the sum to be made available, the amount requested in the budget is automatically approved."

19. "Except as otherwise provided by municipal ordinance, by June 30, the assembly shall appropriate the amount to be made available from local sources from money available for the purpose."

20. Majority Opinion at 313.

tion violates the letter and spirit of AS 14.14.060(c) and is therefore invalid.

### C. *Alaska Statute 29.20.270(c) Explicitly Prohibits a School–Budget Veto.*

Alaska's laws regulating municipal government, codified in Title 29 of the Alaska Statutes, confirm the legislature's intent to use the plain meaning of "assembly" in Title 14's provisions establishing relationships between school boards, assemblies, and mayors. Alaska Statute 29.20.270(c)(1) forbids a mayor from using the veto to "strike or reduce ... appropriation items in a school budget ordinance." [21]

Although the court denies it, this unambiguous provision certainly does "expressly prohibit the municipality from conferring [the veto] power on its mayor." [22] While the court attempts to avoid the express meaning of the statute by finding an implied exemption for home rule municipalities under AS 29.10.200,[23] the attempt is unconvincing.

Alaska Statute 29.10.200 provides that "[o]nly the following provisions of this title [AS 29.] apply to home rule municipalities as prohibitions on acting otherwise than as provided." The statute then lists fifty-nine provisions of Title 29 that directly limit home rule municipalities from "acting otherwise"

than as required therein. This list omits reference to AS 29.20.270(c)(1)'s ban on vetoes of school district appropriation items.[24] Based on the omission, the court infers that subsection .270(c)(1)'s prohibition does not apply to home rule municipalities.[25] But the court draws this inference too hastily. It overlooks the necessary implications of AS 14.14.065's command that cities be treated in the same manner as boroughs are treated under AS 14.14.060 for purposes of determining relationships between their school boards, their assemblies, and their mayors.[26]

The question framed by AS 29.10.200 is whether its omission of the school-budget veto prohibition frees home rule cities to act "otherwise than as provided" by the prohibition. The omission admittedly precludes AS 29.20.270(c)(1) from applying directly to a home rule city. But we must next ask whether the veto ban might apply *indirectly.* The answer to this question is "Yes." As already mentioned, AS 14.14.065 and 14.14.060 specify that for school-budget purposes, the rules governing relationships between a home rule city's school board, assembly, and mayor are the same rules that apply to ordinary boroughs. For these purposes, then, AS 14.14.065 makes a home rule city "a

---

21. AS 29.20.270 provides, in relevant part:

> (a) Except as provided in (c)-(e) of this section, the mayor may veto an ordinance, resolution, motion, or other action of the governing body and may strike or reduce appropriation items.
> ....
> (c) The veto does not extend to
> (1) appropriation items in a school budget ordinance[.]
> ....
> (e) The veto does not extend to an ordinance adopted under AS 04.11.501. This subsection applies to home rule and general law municipalities.

22. Majority Opinion at 311.

23. Majority Opinion at 310–311.

24. AS 29.10.200 lists, in numerical order, provisions in Title 29 that apply to home rule municipalities and that restrict municipal power. Subsection .200(15) lists AS 29.20.270(e), which prohibits vetoes of local-option elections conducted under AS 04.11.501, as a provision applicable to home rule municipalities. *See* note 21, *supra.* The section .200 list mentions no other subsection of AS 29.20.270, thereby implicitly

excluding subsection .270(c)'s ban on mayoral vetoes of school-budget appropriations as a Title 29 prohibition that directly applies to home rule municipalities.

25. *See* Majority Opinion at 312–313.

26. AS 29.20.270(c)(1)'s veto ban and AS 29.10.200's list of exemptions were originally enacted in 1972 as part of the 1972 Municipal Code Revision Act. *See* 118 SLA 1972. The 1972 revision recodified but did not substantively amend AS 14.14.065 or the forerunner of AS 14.14.060. *See* former AS 14.14.065 (1970); former AS 07.15.330(d) (1971). Because AS 14.14.060(c)'s provisions predate AS 29.20.270(c)(1)'s veto ban and the home rule exemptions arising under AS 29.10.200, there is no basis for concluding that the references to boroughs and cities in AS 14.14.065 and AS 14.14.060(c) would exclude home rule cities or boroughs. For purposes of determining relations between the assembly and mayor in school district matters, then, AS 14.14.065 appears to require all cities—home rule and general law—to be treated as an ordinary borough would be treated under AS 14.14.060(c).

borough governed in the same manner as provided in AS 14.14.060." [27]

Since AS 29.20.270(c)(1)'s ban on school district vetoes restricts a general-law borough administrator's veto power when a borough assembly exercises its delegated authority to modify or approve a school budget under AS 14.14.060(c), and because AS 14.14.065 unambiguously regards home rule cities as boroughs in their relationships with their school boards, assemblies, and mayors, AS 29.20.270(c)(1)'s school-budget veto ban attaches to a home rule city: the city is a functional borough under AS 14.14.065 and AS 14.14.060.

Hence, AS 29.20.270(c)'s omission from AS 29.10.200 is inconsequential. Far from indicating that "the legislature impliedly chose to let each home rule municipality decide whether to give its mayor the power to veto or reduce school district budget ordinances," [28] this omission evinces the legislature's recognition that subsection .270(c)(1)'s veto ban did not need to be listed in AS 29.10.200. Again, home rule cities are ordinary boroughs, not home rule cities, for purposes of AS 14.14.060(c); as such, they are governed by the veto ban regardless of its omission from AS 29.10.200. [29] And even if paragraph .270(c)(1)'s prohibition did not apply to home rule municipalities, a mayoral veto would not be authorized under AS 14.14.060(c)'s narrow delegation of power to the assembly alone. The court errs in concluding otherwise.

## II. THE COURT HAS APPLIED THE WRONG STANDARD IN CONSTRUING STATE LAW TO ALLOW MAYORAL VETOES OF SCHOOL BUDGET ORDINANCES.

The court compounds these errors by applying the wrong standard to determine whether a home rule mayor's school-budget veto impermissibly conflicts with the requirements of state law. In selecting the applicable standard, the court assigns predominate weight to the Alaska Constitution's home rule clause, which gives home rule municipalities "all legislative powers not prohibited by law or by charter." [30] Relying on this constitutional language, the court declares that, "[i]n deciding whether the state has limited the powers of home rule municipalities, we first look for prohibitions, not grants of power." [31] While recognizing that state law can sometimes restrict a home rule municipality's power implicitly, the court reasons that an implied restriction can only occur when a " 'statute and ordinance are so substantially irreconcilable that one cannot be given its substantive effect if the other is to be accorded the weight of law.' " [32] This standard leads the court to uphold the municipality's position because, in the court's view, "a mayoral veto over the school budget does not irreconcilably impede the purpose of Title 14." [33]

But the court has fashioned a constitutionally lopsided standard: while heeding the municipality's call to honor the constitution's broad grant of home rule power, this standard all but ignores Repasky's equally compelling call to enforce constitutional language granting the state exclusive control over public education.

As already discussed, the Alaska Constitution's public education clause expressly provides that "[t]he legislature shall by general law establish and maintain a system of public schools open to all children of the State." [34] Our cases hold that "[t]his constitutional mandate for pervasive state authority in the

---

27. AS 14.14.065.

28. Majority Opinion at 312.

29. In contrast, AS 29.10.200(15) does specifically list subsection (e) of AS 29.20.270 as a provision that applies to home rule municipalities. Subsection .270(e) prohibits mayors from vetoing a local option "ordinance adopted under AS 04.11.501." See note 21, supra. Since no provision of Title 4 would independently apply subsection .270(e)'s veto ban to a home rule city, it was necessary for the legislature to list the ban in AS

29.10.200(15) if the legislature intended it to apply to home rule cities.

30. Majority Opinion at 305–306; Alaska Const. art. X, § 11.

31. Majority Opinion at 310.

32. Majority Opinion at 311 (quoting Jefferson v. State, 527 P.2d 37, 43 (Alaska 1974)).

33. Majority Opinion at 315.

34. Alaska Const. art. VII, § 1.

field of education could not be more clear." [35] We have emphasized that the public education clause is "mandatory," "not permissive"; and we have declared this provision to be "unqualified" in specifying that *"no other unit of government shares responsibility or authority."* [36] For these reasons we have sternly warned against inferring a surrender of the state's constitutional prerogatives from any law that transfers limited educational powers to local government:

> That the legislature has seen fit to delegate certain educational functions to local school boards in order that Alaska schools might be adapted to meet the varying conditions of different localities does not diminish this constitutionally mandated state control over education. [37]

In the case before us, then, when we gauge how broadly to apply AS 14.14.060(c)'s delegation of power to "the assembly," we must use a standard that acknowledges the tensions between two competing constitutional mandates: article VII's public education clause and article X's home rule clause. Yet by holding that the mayoral veto must survive unless it "irreconcilably impede[s] the purposes of Title 14," the court inexplicably emphasizes only one of these mandates—the home rule clause. [38]

The court's standard might serve well when used to resolve conflicts between municipal home rule powers and ordinary statutes. But we have never used it to decide the validity of home rule actions that conflict with state laws rooted in the public education clause. To the contrary, our cases involving educational functions articulated a standard that would allow us to interpret a statute like AS 14.14.060(c) as an implicit delegation of power only if the delegated power would affirmatively promote the state's educational purposes.

Beginning in *Chugach Electric Ass'n v. City of Anchorage*, [39] we adopted a "local activity rule" as "an expedient method" to apply when home rule ordinances "either directly or collaterally impede . . . implementation" of policies expressed in state laws. [40]

A year later, in *Macauley v. Hildebrand*, [41] we considered a case involving a conflict between a home rule charter provision that required a school district to use the borough accounting system and a statute that allowed centralized accounting only if the school board consented. [42] Reviewing the test that we adopted in *Chugach Electric*, we noted that "the determination of whether a home rule municipality can enforce an ordinance which conflicts with a state statute" hinged on "whether the matter regulated is of statewide or local concern." [43] Applying this formulation, we struck the charter provision, ruling that "[t]he outcome of the local activity test in the case at bar is dictated by Article VII, Section 1 of the Alaska Constitution [the public education clause]." [44]

We next dealt with conflicting state and home rule provisions in *Jefferson v. State*. [45] There, we backed away from *Chugach Electric*'s local activity rule. Using the constitution's home rule clause as the appropriate starting point for analysis, we enunciated for the first time a test based on the notion of substantial irreconcilability:

> The test we derive from Alaska's constitutional provisions is one of prohibition, rather than traditional tests such as statewide versus local concern. A municipal ordinance is not necessarily invalid in Alaska because it is inconsistent or in conflict with a state statute. The question rests on

---

**35.** *Macauley v. Hildebrand,* 491 P.2d 120, 122 (Alaska 1971).

**36.** *Id.* (emphasis added).

**37.** *Id.*

**38.** Majority Opinion at 315.

**39.** 476 P.2d 115 (Alaska 1970).

**40.** *Id.* at 122.

**41.** 491 P.2d 120 (Alaska 1971).

**42.** *Id.* at 120–21.

**43.** *Id.* at 122.

**44.** *Id.*

**45.** 527 P.2d 37 (Alaska 1974).

whether the exercise of authority has been prohibited to municipalities. The prohibition must be either by express terms or by implication such as where the statute and ordinance are so substantially irreconcilable that one cannot be given its substantive effect if the other is to be accorded the weight of law.[46]

The *Jefferson* test resembles the standard that the court applies here, and that test undeniably gives preference to municipal laws having close ties to the home rule clause. But *Jefferson* qualified its endorsement of the substantial irreconcilability test, declaring that this standard must give way when, as here, a home rule power butts against the mandate of the Alaska Constitution's public education clause.

The public education clause was not directly at issue in *Jefferson*. The conflict there arose between a city charter provision governing disposition of public utility assets and a state law precluding a city located within an organized borough from disposing of such assets after the borough exercised areawide power over the subject.[47] Applying the "substantially irreconcilable" test, *Jefferson* resolved this conflict in favor of the state, finding the city's action to be irreconcilable with the state statute because the statute's "prohibition [was] express." [48] But *Jefferson* did not stop its analysis there. It proceeded to examine its newly adopted standard in light of this court's earlier case law, emphasizing that "[o]ur decision ... is in accord with this court's opinions relating to cases of conflict between local ordinances and state enactments." [49]

*Jefferson*'s discussion of *Macauley v. Hildebrand* is especially germane to the present controversy because the conflict in *Macauley* involved a statutory delegation of educational power implicating the public edu-

cation clause in much the same way that AS 14.14.060(c) implicates the clause here. In discussing *Macauley*, *Jefferson* expressly recognized that conflicts like these present exceptional circumstances in which the home rule clause must ordinarily yield:

> The statute involved in *Macauley* was an express delegation by the state legislature to municipal corporations of a constitutionally mandated legislative power. We reasoned that the language of the state constitution mandating maintenance of a school system by the state vested the legislature with pervasive control over public education. Thus, home rule municipalities were precluded from exercising power over education *unless, and to the extent, delegated by the state legislature;* and the local ordinance was therefore overridden by the statute.[50]

*Jefferson*'s public education test, then, is the obverse of the test that the court espouses here: to invalidate a municipal action, the test looks not for an express prohibition or irreconcilable conflict, but merely for the absence of a specific delegation. Under the test that *Jefferson* articulates for public education clause cases, then, state law has the preference; it prevails in the absence of express delegation: "[H]ome rule municipalities [are] precluded from exercising power over education" except when that power is "delegated by the state legislature." [51]

Our most recent decision addressing a home rule city's exercise of delegated public education power, *Tunley v. Municipality of Anchorage School District*,[52] refines *Jefferson*'s public education clause test by describing the circumstances in which an implied delegation of power may be found.

*Tunley* considered the scope of AS 14.14.060(d)'s provision vesting municipal as-

---

46. *Id.* at 43 (footnote omitted).

47. *Id.* at 41–42.

48. *Id.* at 43.

49. *Id.* at 44.

50. *Id.* (footnote omitted) (emphasis added).

51. *Id.* Notably, *Jefferson* recognized that the statute at issue in *Macauley* directly prohibited the

challenged home rule charter provision at issue there and that the *Macauley* court could have resolved the conflict on that narrow basis, but elected not to: "Although the statutory prohibition in *Macauley* was direct, this court offered another reason for striking down the questioned ordinance." *Jefferson*, 527 P.2d at 44.

52. 631 P.2d 67 (Alaska 1981).

semblies with authority to "determine the location of school buildings." [53] The Anchorage School Board was sued because it closed two schools without assembly approval. [54] In rejecting a challenge to the board's unapproved action; we declined to read subsection .060(d)'s delegation to the assembly of power to determine "location" as carrying with it an implied power over closure. [55] We explained our narrow interpretation of subsection .060(d) by noting that, although the provision's express delegation of approval power over location was consistent with the overall purpose of AS 14.14.060, "[t]his statutory consistency *is not furthered by* . . . assembly power to determine which schools are to discontinue operations." *Tunley* thus enforced section .060's express delegation of the power to locate but suggested that the section could not be interpreted to extend an implied or inherent delegation of the power to close unless that power was necessary to promote consistency with the section's underlying educational purpose.

Applying these principles here dictates the conclusion that AS 14.14.060(c)'s express delegation of approval power only to "the assembly" cannot be construed to imply a broader delegation of veto power to the mayor. For a veto power of that kind would do nothing to promote consistency with AS 14.14.060's basic goal.

As the court itself acknowledges, the veto power adds a new wrinkle to the school budget process—"an extra political element" that was not previously there. [56] Although this extra wrinkle undeniably serves local political interests by enhancing mayoral control over the school budget, it adds nothing of benefit to the statutorily established school budget process: the added political wrinkle is neither necessary nor helpful to promote consistency with any of AS 14.14.060(c)'s educational purposes—the only purposes properly at issue here. Indeed, as we have seen, one of subsection .060(c)'s most prominent

goals is to keep the school-budget process wrinkle free. At best, then, this new political element might prove to be a minor inconvenience to the school budget process.

And at worst, of course, the veto power might prove to be far more than a mere wrinkle or minor hindrance. While local school districts are in one sense a part of municipal government, in another sense— their constitutional and statutory sense-they are independent state institutions that work locally *with* municipal government. [57] And as this court has previously emphasized, "[n]owhere is the independent status of the Anchorage School Board more apparent than in school system budgetary matters." [58]

The statutory delegation of power at issue here, AS 14.14.060(c), attempts to strike a careful balance between the state's vital constitutional interest in maintaining pervasive authority over public education and the legitimate local interest in ensuring "that Alaska schools might be adapted to meet the varying conditions of different localities [in a way that] does not diminish this constitutionally mandated state control over education." [59] By extending subsection .060(c)'s reach beyond the statute's express delegation to the assembly and nudging school-budget approval power within the city executive's sphere of control, the court unavoidably dilutes the school district's independence. The court's action tilts the original balance of powers decidedly away from pervasive state authority and school district autonomy. It distorts, rather than promotes, subsection .060(c)'s educational goal.

Apart from causing this kind of institutional distortion, shifting the balance of state and municipal power will also unleash anomalous procedural consequences. Whether the mayor plays any role in the school-budget approval process will become an arbitrary exercise in assembly timing: the assembly can choose to leave the mayor out of the loop

---

**53.** *Id.* at 76.

**54.** *See id.* at 69–70.

**55.** *Id.* at 76.

**56.** Majority Opinion at 314.

**57.** *See Tunley,* 631 P.2d at 75.

**58.** *Id.*

**59.** *Macauley v. Hildebrand,* 491 P.2d 120, 122 (Alaska 1971).

entirely by delaying its approval action until the last moment or by failing to act at all;[60] and if the assembly includes the mayor by acting promptly, it risks excluding itself if it ultimately is unable to override a veto.

Finally, distributing the assembly's share of school-budget power is bound to have awkward institutional ramifications. A school board acts as its district's legislative body.[61] Subsection .060(c) narrowly delegates this power to the assembly, effectively designating the municipality's legislative body as the board's legislative adjunct. But in this adjunct capacity, the assembly serves the same executive as the board: the school district superintendent. By introducing the mayor to this institutional mix, the court adds a second executive head to the district's adjunct legislative body, creating a patchwork anatomy that invites institutional turmoil. The district's adjunct legislative body now must respond to conflicting signals emanating from separate heads on opposite sides of its torso.

I seriously doubt that any local government would have—or could have—devised such a strange process intentionally. And I am convinced that a state government dedicated to maintaining an independent local school system under Alaska's "constitutional mandate for pervasive state authority in the field of education"[62] should not tolerate its continued existence.

## III. CONCLUSION

Without a trace of irony, the court foretells the consequences of its decision: "Allowing the mayor to veto the school budget ordinance puts the appropriation process on footing equivalent ... to that of other municipal budgets."[63] Yet Alaska's constitution requires school districts statewide to stand on their own feet. By treating the school budget like "other municipal budgets" the veto power correspondingly treats the school board like an ordinary municipal agency, thereby divesting the board of its constitutionally mandated independence. As the

court itself all but concedes, then, its decision spells the end for independent local schools in home rule municipalities. I dissent from the court's opinion and would affirm the superior court's decision holding that AS 14.14.060(c) does not authorize school-budget vetoes.

---

60. See AS 14.14.060(c).

61. See Tunley, 631 P.2d at 75.

62. Macauley, 491 P.2d at 122.

63. Majority Opinion at 314.